

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00449-CV

_____

JOHN DEE SPICER, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE
OF MISTY CHANEY BRADY; JOHN DEE SPICER, CHAPTER 7 TRUSTEE FOR
THE BANKRUPTCY ESTATE OF BP CHANEY; JOHN DEE SPICER, CHAPTER
7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF TEXAS RHH, LLC; AND
ZERA INC., Appellants

V.

MAXUS HEALTHCARE PARTNERS, LLC, Appellee

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-275219-14

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Opinion on Rehearing by Chief Justice Sudderth

## OPINION ON REHEARING

## I. Introduction

This is an appeal from a multimillion-dollar judgment awarding Appellee Maxus Healthcare Partners, LLC damages for, among other things, Misty Chaney Brady's fraud, Texas RHH, LLC's breach of contract, and Appellant Zera Inc.'s breach of contract. In January 2012, Texas RHH, owned by Brady and doing business as Renew Home Healthcare, hired Richard Furtek to organize its financial records to market the company for sale. *Furtek & Assocs., L.L.C. v. Maxus Healthcare Partners, LLC*, No. 02-15-00309-CV, 2016 WL 1600850, at *1 (Tex. App.—Fort Worth Apr. 21, 2016, no pet.) (mem. op.) (reversing denial of special appearance). On December 31, 2012, Texas RHH and Maxus executed an asset purchase agreement (APA). *Id.* at *2. Maxus also signed leases with BP Chaney (owned by Brady) and a management agreement with Zera (owned by Brady and also doing business as Renew Home Healthcare).

Two years later, Maxus discovered that there had been an outstanding IRS tax lien of almost $3 million against Texas RHH prior to the APA's execution, *id.*, which Brady paid off with some of the purchase price funds wired by Maxus before she executed the APA, and the IRS placed a lien on the Zera revenue to which Maxus was entitled under the management agreement. As the parties' relationship soured, Brady changed the controls on the Renew Home Health email system that Maxus had been using since the asset sale, and Maxus sued Brady, Texas RHH, Zera, and BP Chaney

2

(collectively, Appellants), as well as Furtek,[1] in various combinations for various claims, including breach of contract, fraud, harmful access of a computer, and promissory estoppel. Brady, BP Chaney, and Zera countersued, and Maxus prevailed on its claims against them and Texas RHH after a six-week jury trial.

In six issues, which primarily challenge the sufficiency of the evidence, Zera and John Dee Spicer—Chapter 7 Trustee for the bankruptcy estates of Brady, BP Chaney, and Texas RHH[2]—appeal the trial court's judgment. We affirm in part, reverse and render in part, and remand the case to the trial court for Maxus to make an election between its fraud and breach-of-contract awards and for the trial court to reconsider the $100,000 award under APA Section 2.16.

On rehearing, Appellants asked us to correct our original opinion to include a reversal of the $818,525.76 in costs and expenses awarded to Maxus against Texas RHH. Maxus responded that Appellants had failed to adequately brief the issue, and Appellants replied that their briefing was adequate to include the reversal of costs and expenses.[3] We grant Appellants' motion and correct the opinion to reflect the deletion of the $818,525.76 in costs and expenses awarded to Maxus.

---

[1]Furtek settled with Maxus before mandate issued in his special appearance appeal. Maxus also sued Brady's husband C.J., who is not a party to this appeal.

[2]The bankruptcy court lifted the stay to allow Maxus to obtain entry of a judgment and for Appellants to appeal.

[3]Appellants mentioned expenses in their sixth issue on page xvi of their brief, under "Issues Presented," and again in their conclusion and prayer on page 70 of their

3

## II. Background

Before we may further introduce the actors, we must set the stage with background on the highly regulated home healthcare industry. To get paid for services rendered to Medicare patients, a home healthcare company in Texas must have a Medicare provider number from the Center for Medicare and Medicaid Services (CMS) and a state license from the Department of Aging and Disability Services (DADS). Medicare revenue is accounted for through a 60-day period, and a home healthcare company's CMS cost reports, which must be filed annually, break down revenue to direct cost per discipline.

Texas RHH and Zera, which were operated as Renew Home Health so that Brady could use one set of marketing materials and a single employee benefit program, each owned a Medicare provider number. Renew Home Health patients in Granbury were treated under Zera's provider number, but Zera had no employees; the Granbury employees belonged to Texas RHH. According to Brady, Texas RHH and Zera had an unwritten management agreement for Texas RHH to use Zera's provider number and to enjoy the benefit of that provider number's revenues.

brief. Because we are compelled to follow the supreme court's instructions to "liberally construe issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants," *El Paso Natural Gas Co v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 316 (Tex. 1999), we have reviewed and corrected the opinion to reflect Appellants' having raised the issue of expenses in their brief.

Texas RHH and Zera used several software systems—Kinnser, QuickBooks, and ZirMed—in their operations. Kinnser is used for clinical documentation, billing, and posting payments from Medicare, and Texas RHH and Zera each had a Kinnser account. Brady used the same QuickBooks program, an accounting software package used to track revenues and expenses and to run financial reports and payroll, for both Texas RHH and Zera. Although most of Renew Home Health's revenue came from Medicare, a small percentage came from private insurance, necessitating the use of ZirMed—a third-party clearinghouse for insurance claims. Texas RHH used a subaccount under Zera's ZirMed contract.

In 2012, a new home healthcare company would have had to have waited three years to obtain a Medicare provider number, so the quickest way to enter the market—despite a federal regulation that prohibited a Medicare provider number's change of ownership within 36 months of its most recent change in ownership (the 36-month rule)—was to buy an existing company that owned a Medicare provider number. *See* 42 C.F.R. § 424.550 ("Prohibitions on the sale or transfer of billing privileges"). Because of the two Medicare provider numbers owned by Texas RHH and Zera—even though Zera's provider number could not be transferred until January 19, 2014, due to the 36-month rule—Maxus became interested in buying Renew Home Health's assets as a shortcut into the home healthcare market.

## A. The Main Actors

### 1. The Maxus Team

5

Angie King,[4] Maxus's president, and Stevan Hammond, Maxus's owner, testified about the parties' agreements and relationships before and after the APA, and Steven Anderson, Maxus's former vice president of operations, testified about his involvement in Maxus's due diligence process and his later work for Brady.

Angie had been vice president of business development for Foundation Management Services (FMS), a company that acquired home healthcare companies, until she was laid off in January 2012. In her eight years with FMS, Angie had led acquisition and transition teams in addition to working with start-up home healthcare companies and conducting training on regulations. Angie and Hammond formed Maxus to acquire home healthcare companies.

Although Hammond had no prior experience in home healthcare, over the course of thirty years, he had transformed himself from a homeless high school dropout into a businessman in direct consumer marketing and real estate and had earned two bachelor's degrees. Although Hammond said that he had "actually struck more bad business deals than good" ones, he had put his life savings into the Texas RHH acquisition.[5]

---

[4]Angie King has the same last name as one of the witnesses, so we refer to her by her first name to reduce confusion.

[5]By the time of the trial, Hammond had been involved in three asset acquisitions—Caring Hearts Home Health, Renew Home Health, and a restaurant.

Hammond said that Angie, whom he married in November 2015, had been "running the show" on the Texas RHH acquisition. According to Angie, because she had "a lot of experience" and because Anderson (who had run FMS's consulting division before he was laid off) was "fairly experienced in home healthcare," Maxus had not hired a CPA to review Texas RHH's books and records during due diligence. Maxus had closed on at least one company prior to the Texas RHH transaction,[6] so Angie felt that they could do the transaction without outside help by building warranties and representations into the APA.

Anderson left Maxus in December 2013 when he and Angie disagreed over her decision to demote him and cut his pay. He worked for Brady during the lawsuit's pendency.

## 2. Brady

Brady, who had a bachelor's degree in nursing, formed Texas RHH in 2006 after buying a Medicare provider number, and she bought Zera in 2011. Brady started with no patients, but by December 31, 2012, Texas RHH had approximately 600 patients, and Zera had 100 patients; Renew Home Health had a payor mix of approximately 92% Medicare; and Texas RHH had about 150 employees. Brady was responsible for Texas RHH's accounting—including paying bills and processing

---

[6]An attorney who handled general business issues for Hammond had participated in the Caring Hearts acquisition, a $500,000 transaction.

payroll since the company's founding—but did not pay Texas RHH's payroll taxes from 2006 to 2011.

**B. Texas RHH's Tax and Financial Situation, Act I**

In 2009, Lawrence Brown, the founder of Brown P.C., a tax litigation firm, made a voluntary disclosure for Brady to the IRS about Texas RHH's failure to pay payroll taxes, and he referred her to a CPA. Brady had known since at least 2009 that employers have a legal obligation to withhold taxes from employee paychecks and then to remit those taxes to the IRS,[7] and she knew that a business owner who failed to pay that withholding could be held personally liable for it. *See* 26 U.S.C. § 6672. Since 2009, the IRS had been imposing a continuous 15% levy on Texas RHH's Medicare revenue, garnishing over $1.3 million between November 2009 and November 2012. An IRS levy attaches to a Medicare provider number until the taxes are paid in full.

In the meantime, instead of paying her payroll taxes, Brady used Renew Home Health's revenue to grow the business and to cover personal expenses, including Dallas Cowboys season tickets. In 2011, she bought Zera's stock, netting the second Medicare provider number,[8] and through BP Chaney, she bought the office building

---

[7]IRS Form 941 pertains to quarterly payroll taxes; IRS Form 940 is a payroll tax annual report. Texas RHH did not file its 941s and 940s from 2006 to 2008.

[8]While Brady testified that she did not believe that Texas RHH had financed the transaction, one of Texas RHH's 2011 notes payable was to Zera's previous owner for $346,736.

that Texas RHH used for its Fort Worth headquarters and an office building for Zera to use in Granbury.[9]

In 2011, Cory Mertz, a broker working for a home healthcare merger-and-acquisition firm, contacted Brady about selling Texas RHH. Brady then began organizing her businesses' financial information, entering bank statements from 2009 onward for 15 bank accounts so that her accountants would "have as accurate a baseline as possible to start[] keeping [her] books." Because Brady was unable to produce any of the financial statements—profit-and-loss statements, balance sheets, and income statements—that provided material information for potential buyers, Mertz introduced her to Furtek.

Brady told Furtek that her QuickBooks "were a mess."[10] At trial, she acknowledged that her QuickBooks had "probably thousands" of missing check numbers because if she printed a check wrong, she shredded it instead of listing the check—a company record—as "void."[11] She also booked reconciliation discrepancies as lump sums, including one for $49,000.[12]

---

[9]Brady did not pay rent between her companies until October 2012.

[10]Brady said that by characterizing her records as a "mess," she did not mean that the records were inaccurate.

[11]Cindy Carradine, Maxus's forensic consultant, discovered over 2,100 instances of missing checks in the Texas RHH QuickBooks and over 300 duplicated checks.

[12]Carradine said that in May 2012, there was a six-day "flurry" of activity in Brady's QuickBooks during which 18 instances of reconciliation discrepancies

Furtek told Brady that he would organize her financial information but not guarantee its accuracy.[13]  He pulled information from QuickBooks and the Kinnser accounts to create accrual-based financials for Renew Home Health's consolidated (Texas RHH and Zera's combined) statement of operations and balance sheet, which he named "Adjusted QuickBooks Financials."[14]

Brady told Furtek about Texas RHH's tax liability and the IRS's levy, and before Brady's August 2012 meeting with the IRS, Furtek cautioned her to make sure that her tax payment offer took into account how much money she would need to fund the company's current growth.  Brady expressed her uncertainty to Furtek, stating,

> I am not for sure how to fund the growth and stuff in.  If they give me a hard time tomorrow, is it ok with you if I give them your information and tell them I am working with a financial consultant and new billing expert to get things in order[?]  All of my 2012 payments are current[,] and the last balance they said I owed is [$]1.4 million.  I have $200,000 to

---

occurred, 12 of which were more than a year old.  In June 2012, the CPA who Brady had hired to prepare Zera's cost reports told Brady that she was not following the accounting rules in keeping Zera's books.

[13]Although Furtek made this disclaimer in his engagement letter, Brady complained that she had not known that he was not going to check her work.

[14]QuickBooks generates cash-based financials, showing revenue and expenses booked as they occur, while Kinnser is used for accrual-based financials—Medicare services that have been billed but not yet paid—based on billing. Mertz testified that accrual statements are the norm in selling healthcare companies because a buyer wants to calculate value using the more accurate reflection of earned, but not necessarily received, revenue and expenses incurred but not yet paid.

put down and then work out [a] payment plan. Hopefully, that will be enough[,] and they will work with me.

The IRS gave Brady 60 to 90 days to obtain a loan to pay the tax liability.

In pursuing the loan, Brady told Furtek that the banker wanted to see revenue, debt, and profitability, and she sought his advice. Furtek replied on August 30, 2012, stating, "Attached are draft accrual basis financials. . . . You'll see that the payroll tax liability is shown as Net Debt. If presenting to a bank[,] I would suggest[] show[ing] payroll tax liability separately."[15] Brady said that the banker told her that if she was thinking about selling her business, she could just pay the IRS from the sales proceeds instead of taking out a loan.

## C. Maxus Shops for Home Healthcare Acquisitions

Maxus wanted to buy home healthcare agencies with approximately 90% Medicare clientele; a good patient census; and good clinical charting, patient care, and employees.[16] After acquiring Caring Hearts in April 2012, Maxus performed due diligence on several other agencies. Anderson said that by the time that Texas RHH came on the market, the Maxus team was feeling "pretty desperate" because nothing

---

[15]The "Net Debt and Notes Payable" breakdown in Furtek's August 30, 2012 attachment was not provided to Maxus.

[16]Anderson said that during due diligence, Maxus verified Renew Home Health's patient census and confirmed its Medicare percentage and the quality of its patient care, employees, and community reputation. Maxus did not sue for any representations related to these items.

11

had panned out and they needed another agency to make Maxus's bottom line.[17] He said that Mertz kept telling them, "Hey, I've got a good agency coming to market. They're just not quite ready, but it's coming."

On September 4, 2012, Mertz emailed Brady and asked her if she knew Angie, who was "looking for an agency" and "ha[d] money behind her."[18] Brady replied that she was familiar with FMS and that Angie "sound[ed] like someone who would pay a premium price[] because [she would be] eager to get started and not already established." Later that day, Mertz told Angie that he expected an $11 million-revenue agency to become available soon.

On September 4 and 5, Furtek sent Texas RHH's "preliminary accrual basis financials as of July 31, 2012" to Brady and Mertz. Mertz sent Angie the September 5 financials, from which Angie said that Texas RHH appeared to be a good, strong company. On September 10, Angie and Anderson met Brady.

At the September 10 meeting, Anderson said that they had discovered that Brady had been an FMS client and had been to one of Angie's seminars, so they "kind of had this connection." Brady told them generally that when she started Texas RHH in 2006, she had struggled initially, but according to Angie, Brady did not tell them

---

[17]Hammond noted that Maxus looked at two or three other agencies between April and September 2012 but that "in those deals during the due-diligence phase[, Maxus had] discovered things that discouraged [it], so all that money [spent on lawyers and accountants] was just sunk costs."

[18]Mertz knew Angie from her time at FMS.

about Texas RHH's specific cash-flow problems from 2009 to 2011. Anderson disagreed, stating that Brady had told both of them that she had once sold her truck to make payroll.

The day after the meeting, Angie sent an initial due diligence request to Brady, who quickly replied with audited cost reports for both Medicare provider numbers and financial data from 2010, 2011, and 2012. The balance sheets that Brady provided to Maxus did not show that there were existing unpaid payroll tax liabilities; however, on line 36 of the third-to-last page of 113 pages of cost reports, under "Liabilities and Fund Balances: Current Liabilities," an entry labeled "payroll taxes payable" appears with the amount of $1,891,303 for a period from January 1, 2011 to December 31, 2011. Angie gave the following testimony about line 36:

> Q. This was sent to you three days after you met with Ms. Brady, right?
>
> A. That's correct.
>
> Q. It's listed under "Current Liabilities,"[19] right?
>
> A. That's correct.
>
> Q. Where you testified yesterday you would want to list any payroll tax obligation owed to the government, right?

---

[19]Brown, Brady's tax attorney, testified that tax liabilities and penalties that were due and owing should be recorded as current liabilities on a company's balance sheet, and Furtek agreed that tax liabilities and penalties were a current liability for purposes of financial reporting on a balance sheet. However, Furtek clarified that Brady had not hired him to do an audit.

A. That's correct.

Q. I think you also testified yesterday that you weren't aware of any place where payroll tax liability had been listed in any document you reviewed; is that correct?

A. That's correct.

Q. Is it fair to say that because there were thousands of documents, maybe you just missed it?

A. Yes.

Q. But it's listed right there, isn't it?

A. I see that. Yes.

Q. $1.8 million tax liability.

A. Yes.

None of the other financial documents that Texas RHH gave Maxus showed the company's cumulative IRS tax liability—which, with over $1 million in penalties and interest, eventually became over $3 million—or any state tax liability.

While Brady agreed that she had never given Maxus anything prior to closing that showed that Texas RHH owed $3 million to the IRS, she insisted that tax liability did not matter because Maxus was buying only assets, not stock. With regard to the distinction between asset and stock purchases, Brady explained that "[w]ith a stock purchase you get the whole company," including the tax ID number, "and you're responsible for anything that happened before you owned it"; in contrast, with an asset acquisition, "you basically just get to buy what you want[,] . . . and you're not

14

responsible for anything that company did." Angie, on the other hand, said that liabilities still mattered in an asset sale because they were an indicator of the company's financial performance and the assets' strength and because of Medicare's rule that liabilities follow the provider number.

On the financials that Maxus was given, the "Net Debts and Notes Payable" line item was not broken down to show the payroll tax liability (or any of its other component parts), and Brady and Furtek both conceded that no one could see how much Texas RHH owed to the IRS by looking at the financials that were provided to Maxus. Furtek described the line item as a generic catchall that netted out "things that weren't related to the ongoing operations of the business"[20] and related that while the decision to collapse the information in that line item had been Brady's in consultation with him, its purpose was not to hide the tax liability. He distinguished between current "operating" liabilities and "generically current liabilities" that were not part of day-to-day operations and said that the financials were a pre-due diligence "snapshot" for prospective buyers of what was involved in the business but that a

---

[20]For example, Furtek said that the debt Brady owed Texas RHH—$904,929 as of July 31, 2012—in the "Net Debt and Notes Payable" section reduced the overall debt. Carradine said that she saw no evidence of a note from Brady to Texas RHH to show Brady's intent to pay the money back. Carradine also said that it was "never proper to offset an unrelated receivable against a liability," that she could not imagine a scenario in which it would have been proper to book a tax liability as a note payable, and that she was unaware of any accepted accounting principle that would have allowed Texas RHH to do so. She said that because offsets were not allowed against unrelated liabilities, "you certainly would not offset a payroll tax amount that you owed with an amount that is owed to the company by its owner."

15

prospective buyer would be expected to "drill down into the details of everything related to the business."[21]

Mertz said that it was important to disclose accurate information to a potential buyer; that based on the financials provided to Maxus, there was no objective indication that there was a million-dollar tax liability; that he did not recall Brady disclosing such a "significant" tax liability to him; and that if he had known about it, he would have advised Brady to disclose it during due diligence to avoid the deal's falling apart because of a breakdown of trust. However, Mertz also said that he assumed that a buyer would "drill down into these numbers and discover what . . . it's for before they close. That's, you know, . . . typically the way it works." Mertz also said that it was incumbent upon a buyer to ask the right questions.

However, when Angie asked Mertz and Furtek about the "Net Debts and Notes Payable" line item, they told her that "it was all owner debt," i.e., what the company owed to Brady. Angie said that "owner's debt" did not raise a red flag for her because she had "seen several times where people [had] take[n] maybe their

---

[21]Bryon Hammer, Brady's transactional attorney, said that he would "assume as part of the due diligence" that a buyer would look behind "each of these line items." Hammer had represented Brady, Texas RHH, and Zera and testified at trial about the parties' letter of intent, the APA, and their other interactions. He also testified that Maxus had sued his firm claiming that Hammer had given Hammond legal advice at the parties' December 26, 2012 meeting on the APA; Hammer disputed the claim, and Maxus ultimately dropped that lawsuit.

savings or their 401(k) . . . and [had] put it into the business to get the company started, . . . and they want[ed] to get that money back out of the company."

Brady said that when Mertz told Angie that it was owner's debt, Angie did not want to know more. Brady stated that she had assumed that Maxus knew about the tax liability because "they're the ones that said they were experts in doing acquisitions and mergers and that's what they did for a living before they decided to be a home health agency and that's why they asked for all the items they asked for on the due diligence list." Brady conceded during cross-examination that the "Net Debt and Notes Payable" in what Furtek had sent to her (but not to Maxus) showed amounts that Brady owed to Texas RHH and amounts that she had taken out of Texas RHH as distributions in 2010, 2011, and 2012, and she acknowledged that interest on the unpaid payroll taxes had continued to accrue while she took money out of the company.

On September 25, Mertz sent to Angie Brady's answers about owner distributions[22] and overdraft charges caused by cash-flow issues in 2010 and 2011. Angie said that the overdraft charges had been an "add-back"[23] that Maxus had used

---

[22]Maxus was given data showing that Brady had taken the following amounts as owner distributions in lieu of salary: $588,690 in 2010; $812,856 in 2011; and $1,082,130 in 2012.

[23]An add-back is a one-time, nonrecurring expense, not an ordinary operating cost.

17

when valuing the company. Not long thereafter, Mertz sent Angie the broker's book that he had prepared with Brady and Furtek's information.

The broker's book described "Texas RHH, LLC dba Renew Home Health" and listed the company's locations—a corporate office and branch in Fort Worth and branches in Abilene, Breckenridge, Mineral Wells, and Granbury. Mertz said he had understood that all of the locations were for sale and did not recall any discussion about excluding the Granbury (Zera) branch from the transaction. Hammond and Angie both understood that the transaction included Zera based on the broker's book and the consolidated financials; Angie stated: "They just ran it as one company and one QuickBooks." Brady said that the broker's book showed only Texas RHH's operations, which included the right to operate Zera, but she conceded that the unwritten Texas RHH–Zera management agreement was not mentioned.

Hammond had been impressed with the financials attached to the broker's book, stating, "I think it looked better . . . than most of the other deals that we looked at, and they had a great growth rate on their revenues and great profit increases and virtually no liabilities relative to their assets." Angie used the financials, which showed an increase in net income every year since 2010, to put a multiple of five[24] on the company's EBITDA (earnings before interest, taxes, depreciation, and amortization)

---

[24]Angie explained that a multiple of five would be used for a high-performing company.

18

number[25] to calculate Maxus's first offer.  Hammond said that in addition to EBITDA, other factors in evaluating how much Maxus was willing to offer included "the rapidly increasing profits, the growth rate of the revenues, . . . the rapidly decreasing current liabilities," and the company's current ratio—a comparison of current assets to current liabilities showing how much debt per dollar of revenue a company has.

Contrary to the above representations, Brady and Furtek both knew that if Texas RHH had paid its tax debt, it would have eliminated net income on either a cash or an accrual basis, and the company would have been out of business and bankrupt.

## D.  Maxus and Texas RHH's Negotiations and Letter of Intent (LOI)

Maxus's opening offer was $6.5 million.  Brady made the following $10 million counteroffer through Mertz:

- Purchase price $10 million.  My client is confident that the new financials, to be published later this week[,] will support this valuation.

- Patients currently enrolled through the Granbury [Zera] provider will be readmitted, as necessary, through the Fort Worth [Texas RHH] provider.

---

[25]EBITDA is how financial markets measure future cash flow—the benefit-generating capacity associated with assets.  Mertz said that a multiple of EBITDA is used to determine a purchase price depending on a company's size and risk and that it was not unusual for a $10 million-revenue company to command a multiple of five. He did note, however, that if a company were losing money, it would not be appropriate to suggest a multiple; in that case, one would review its revenue and gross margins to come up with a value.

Any new admissions/recerts which would previously have gone to the Granbury provider will be admitted into Fort Worth. She is willing to keep this provider number alive until it is transferable.[26]

- The holdback for Granbury [Zera] should be approximately $250,000 – commensurate with the value of a DFW provider number.

Brady said that the language in the last two bullet points did not end up in the APA. Angie, however, said that based on Brady's counteroffer, her understanding was that Zera's patients would be transferred to Maxus and that the Zera provider number would be kept alive until transferable. Angie stated that in the parties' LOI, there was a holdback for the Zera provider number but that there was nothing defined separately as a holdback for it in the APA. Instead, Angie said that the parties structured the deal "so that the last payment would be a significant[ly] higher amount in order to be able to have those funds available like a holdback. It was just not termed a 'holdback.'"[27]

Based on the September 2012 financials provided by Brady, Maxus countered Brady's $10 million offer with one for $7.5 million[28] in mid-October. Maxus provided

---

[26]Brady said that this was just an offer and that for $10 million, she had been willing to sell all of Texas RHH's operations, "which would have included the Zera revenue generated from the Zera patients," the Zera patients' readmission under the Texas RHH provider, and keeping the Zera provider number alive until the 36-month period had expired and it was "able to be sold to Maxus."

[27]The APA's payment schedule listed the final payment as $750,000 (plus interest) due January 1, 2015.

[28]Angie told Hammond that based on the September 2012 financials, the company had an 18% profit margin; with a holdback of 20%, Maxus would have an

20

another due diligence checklist and a draft letter of intent in early November. Brady forwarded the draft to Furtek, who recommended that she delete the representations and warranties about the accuracy of Texas RHH's financial statements and reports.[29] Brady did not follow Furtek's advice but denied that she had ignored it to avoid raising a red flag for Maxus.

On November 14, Angie and Brady signed the LOI. It provided that Maxus would pay $6 million at closing; $750,000 in 2013 upon CMS's approval of the change of ownership of Texas RHH's provider number; and $750,000 in 2014, less $150,000 if the Zera provider number's change-of-ownership approval had not yet occurred. The LOI also stated, among other things, that Maxus's obligation to complete the purchase was subject to Maxus's being able "to enter into an acceptable management agreement with Zera, Inc.[,] the holding company of the Granbury provider number until that business is sold to [Maxus]."

---

initial outlay of $6 million and two $750,000 installments, and she projected a 15% growth rate that would allow Maxus to cover the holdbacks with profits. Angie's calculations included net income and add-backs such as rent and owner distributions to reach a value of $1.5 million with a multiple of five. She reached approximately the same number after considering annualized total revenue and expenses.

[29]One of the LOI's conditions required Texas RHH to provide a representation and warranty that "all information and financials delivered to [Maxus] during the course of due diligence are accurate and complete in all material respects (including no more than a two percent (2%) discrepancy in the []financials)." Brady conceded that there was more than a 2% discrepancy in the financials.

Mertz said that based on the parties' discussions and the LOI, he understood that the parties' intent had been for Maxus to acquire the Zera provider number upon the expiration of the 36-month period and that the Zera provider number was included in the $7.5 million purchase price. Brady never told him otherwise. Anderson acknowledged that as to the Zera provider number in the LOI, "it was [Brady's] intent to sell it to us and it was our intent to buy it."

**E. Texas RHH's Tax and Financial Situation, Act II**

In early November 2012, Brady told Hammer, her attorney, that Texas RHH owed money to the IRS for unpaid employment taxes, interest, and penalties, and he referred Brady to Brown.[30] Brady asked Furtek for documentation to help her avoid the IRS penalties, stating,

> They [Brown P.C.] think [that] they can get most of the penalties waived especially if we are showing that we might possibly [sell] and pay it off in full by the end of the year. My attorney has asked for some financials showing a hardship and/or loss for the years I owe for: 2009, 2010[,] & part of 2011. Any suggestions on what I should give them[?] I looked at the P&L in QuickBooks per year per cash basis[,] and it shows a loss for 2009, small profit for 2010, and smaller profit for 2011. I can also provide bank statements.

---

[30]Texas RHH also had state tax problems. On November 6, 2012, the State of Texas filed a notice of state tax lien in Tarrant County against Texas RHH for unemployment taxes in the amount of $18,891.26 for the first and second quarters of 2012. That lien was not released until November 2014.

Brady told Furtek, "The IRS lady said they might be willing to drop all penalties if it is paid by end of year[,] which could be close to [$]1 million."[31] Furtek sent Brady some cash-basis financials for Texas RHH.

Prior to the LOI's execution, Lisa King,[32] relying on facts provided to her by Brady, told the IRS that Brady was "in the process of selling the business in order to pay the outstanding tax liability in full."[33] Lisa asked the IRS to hold all collection actions until December 31, 2012, to release the 15% levy because "it has negative connotations to the purchaser,"[34] and to provide a payoff amount for December 31.[35]

Six days after the parties signed the LOI, the IRS filed a notice of federal tax lien showing an unpaid balance of $2,740,138.47 for "Texas RHH LLC Renew Home Health" for tax periods of March 31, 2009 to December 31, 2011, and for assessment dates April 25, 2012, and May 11, 2012. The lien attached to all of the taxpayer's real

---

[31]Angie testified that Brady had insisted that the deal had to be done by December 31, but Brady denied that her insistence had been about avoiding $1 million in IRS penalties and retorted, "In the end, I didn't get any penalties waived." Mertz, Hammer, and Angie agreed that December 31 was the APA's deadline because of a capital gains tax increase that was set to go into effect the next day and that would have affected both parties.

[32]Lisa had acted as Texas RHH's enrolled agent—a nonlawyer who negotiates with the IRS on a taxpayer's behalf.

[33]Brady disputed at trial that she had to sell Texas RHH to pay the tax liability.

[34]Brady disagreed that the "negative connotations" were that Maxus would not want to buy Texas RHH's assets if it knew about the IRS liability.

[35]Texas RHH's estimated payoff amount was $3,090,919.84.

23

and personal property. Maxus was not given a copy of the notice, but Lisa testified that the IRS's filing the tax lien would have put a prospective buyer on notice if a lien search had been performed.

While Maxus conducted due diligence, Lisa asked the IRS for an abatement of the late-payment penalties assessed against Texas RHH due to "reasonable cause" in that Texas RHH had been in dire financial straits during the quarters (March 31, 2009–December 31, 2011) for which there were delinquent payroll tax obligations. The IRS denied the abatement, and on December 20, 2012, Brady appealed the denial, making the following statements under penalty of perjury: Texas RHH had struggled to meet its financial obligations since its formation in 2006; it had been delinquent in paying expenses necessary to remain a going concern; in all eleven of the listed quarters, Texas RHH had incurred significant net operating losses; and it had fallen so far behind on its payroll tax liability that it had "almost ceased to be a going concern." Brady did not share this information with Mertz or Maxus.[36]

Brady did not tell Lisa that one of Brady's companies owned the buildings occupied by Renew Home Health in Fort Worth and Granbury or that she had bought Zera in January 2011. She did not tell Lisa or Brown about having taken over $1 million in loans and distributions out of Texas RHH, and she allowed them to

---

[36]Mertz said that if he had known, he would have urged Brady to disclose the information to Maxus because Maxus was entitled to it.

24

make representations to the contrary on her behalf.[37]  A week before Brady told Angie that she did not have 2009 financials for Texas RHH, Brady printed out a 2009 profit-and-loss statement for the IRS.

## F. Due Diligence

Due diligence continued after the parties signed the LOI.  Brady purchased access to Firmex, a document-sharing platform from which Maxus accessed the financials that had been prepared by Furtek, as well as Brady's 940 and 941 filings, state payroll tax reports, tax returns, franchise tax reports, cost reports, remittance advices,[38] and bank statements.

Anderson said Maxus used Firmex to look at "tons of stuff" and verified the items Maxus was most concerned about because it knew that Brady's QuickBooks had not been maintained by a professional bookkeeper.  Anderson stated that in reviewing Texas RHH's financials, Maxus's primary concern had been Medicare revenue for the preceding three years—2010, 2011, and 2012—and not liabilities because it was an asset purchase.  However, Anderson acknowledged that Maxus

---

[37]Lisa said that she would not have knowingly signed a false statement and that she would not have sent the letters if she had known that Brady had taken out distributions or loans from Texas RHH in excess of $1 million.  Brown agreed with Lisa and said that Brady had led him to believe that she was putting money into the company to keep it going, not taking money out of it.

[38]A remittance advice is a Medicare report indicating what has been paid.  A financial adjustment to a remittance advice is an adjustment to the Medicare payment—a recoupment or any type of withholding.

cared about liabilities to the extent necessary "to see an overall picture of the company" and to make sure that the acquired assets would have no liabilities associated with them.

Anderson and Angie compared the remittance advices and statements from Kinnser to Texas RHH's bank statements and found that "the cash to cash came out fairly close." Brady's corrected 941s showed that she had owed $720,965.36 on her payroll taxes in 2010 and $876,178.91 for three quarters in 2011, but Angie did not ask Brady about the corrected 941s because the tax amount "wasn't reflected on the financials . . . as owed." Anderson reviewed the 940s and 941s, but only to make sure that Texas RHH had been filing the reports, and he said that Maxus did not compare the 941s to the bank statements because they were not looking at expenses.

Anderson acknowledged that the remittance advices would have shown if Medicare was withholding payments and that Maxus could have used each remittance advice to calculate withholdings and reach a total levy amount.[39] But Anderson said that Maxus did not do this "[b]ecause we really wanted to match what was net deposit to net revenues," and the net deposits and net revenue matched. Angie had relied on Anderson to review the remittance advices, and he never told her about the $457,000 in levies shown for 2010 or the total $1.1 million in levies shown for 2010–2012.

---

[39]The "LE" code on the remittance advices stands for "levy." Angie said that she had not known that "LE" stood for "levy" before the lawsuit, but she acknowledged that Maxus could have discovered the existence of the tax levy prior to executing the APA by reviewing the remittance advices.

26

Anderson said that he had not known about the IRS levies and that the first time he saw the notice of federal tax lien was during the trial.

In mid-November, after Furtek had uploaded the financial files to Firmex, he told Brady that Maxus would "likely want to see more financial info but this should get them started." In response, Brady asked him, "Should I bring up the payroll taxes owed, or let them ask me about it?" Furtek replied,

> I wouldn't call them special to let them know.[40] If discussing payroll taxes or the balance sheet (shown as debt)[,] I would let them know it is out there but clearly totally your responsibility. They are acquiring assets[,] so they are not responsible for the tax [ID] that owes taxes. However, they may insist that amount is paid at closing.

Brady denied that she had kept the payroll tax liability information a secret from Maxus but conceded that the only document that showed $2.7 million in one place was on the IRS's lien, which she did not provide to Maxus. She said that she had "absolutely assumed [Maxus] knew" about it because it was on the cost reports, the 940s and 941s, the remittance advices, and "on some of the financials" and that she had asked Furtek about whether to it bring it up "because [she] had already provided every document they ever wanted. It was -- it was in all kinds of documents there."

---

[40]Furtek explained that Brady's email had been on a Saturday afternoon and that he did not think the payroll tax information was "something that would necessitate a special call on a Saturday afternoon."

27

Anderson said that he did not consider performing a tax lien search; that Angie and Hammond had never asked him to; and that in his experience, one only needed to do so if one were buying a company and assuming its liabilities. Angie admitted that Maxus could have discovered the IRS's November 20, 2012 tax lien if it had performed a tax lien search but said that Maxus had opted to rely on Texas RHH's representations and warranties in the APA because they had "always relied on this and . . . [had] never had an issue until now." Hammond agreed, stating that he did not think they needed to do a lien search if the seller made express warranties that there were no unpaid taxes, levies, or liens.

Maxus did not hire any outside parties to review the financial information during due diligence, but Angie discussed the reconciliation of Texas RHH's numbers with Martin Bradley, an accountant in one of Hammond's other businesses, not for the valuation determination but because Maxus had been thinking about seeking a small business loan to pay for the asset acquisition.

In Bradley's November 28, 2012 email to Angie, he stated, "[T]he first thing any potential lender will look at will be a reconciliation of the tax returns to the financials. I have attempted to create one using the tax returns and financials provided." He asked her to look at his spreadsheet and then to call him so that he could "walk [her] through [his] logic and how that drives the questions [that] RHH [would] have to answer. With this reconciliation, [Maxus] [would] then be able to discuss and verify potential addbacks."

Bradley's spreadsheet showed a net income loss in 2009, a net income gain in 2010 of about half of what had been represented to Maxus, and a smaller net income gain in 2011. Texas RHH did not own Zera in 2009 or 2010, so Bradley's chart did not account for it during those years; his chart showed that Zera had suffered a net loss of $86,167 in 2011. The consolidated cash basis net income number for Zera and Texas RHH together in 2011, according to Bradley's chart, was $34,392.

On November 29, 2012, Angie sent Furtek an email, copying Brady, with Bradley's chart attached. Furtek did not recall any specific questions that Angie had asked him when they had spoken on the phone after her email, and he asked Angie to put her requests in writing so that he could share them with Brady.

On December 1, Angie sent Brady a draft APA using a template prepared by a law firm that Maxus had hired during the summer of 2012. Brady did not read the draft when she received it but rather forwarded it to her attorneys to "let them do their thing." Mertz testified that he suspected that, by then, Brady "had become a little bit disenchanted" with the parties' negotiations.

On December 11, Furtek sent Brady an email to ask her about whether to include the HHCAHPS[41] adjustment—a 2% patient survey Medicare withholding

---

[41]HHCAHPS is an acronym for Home Health Care Consumer Assessment of Healthcare Providers and Systems. *See* CMS.gov, Home Health CAHPS (HHCAHPS), *at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/CAHPS/ HHCAHPS (last visited Dec. 14, 2020). The HHCAHPS survey became a Medicare requirement in 2010. *Id.*

penalty[42]—in the financials, stating that "[a] slightly lower number without explanation . . . is more credible and sends a stronger message than higher $. However, if you or [Mertz] feel very strongly about including in Net Revenue I'll make the change." The next day, Brady forwarded the email to Mertz, adding, "Please see [Furtek's] email below about changing the financials. I told him that was fine and [that] we would go with his recommendation. I sent Angie the financials we had." Brady said that Texas RHH had included the HHCAHPS figure, which equated to $180,000 to $200,000 more revenue each year. Brady sent Angie Texas RHH's November financials and projected December financials and asked her to get in touch with Furtek about her financial questions.

Hammond said that he had reviewed the November 2012 financials and that "[i]t was really amazing[] because it seemed like each month things got better and better, and the liabilities kept getting smaller and smaller." He said that Texas RHH's growth seemed "explosive" and that "the current ratio [of assets to liabilities] was getting really extraordinarily better with every financial statement [Maxus] got." When the LOI expired on December 15 without an executed APA, Anderson said that the Maxus team was "pretty devastated" because they had put in so much work.

## G. APA Negotiations and Execution

---

[42]By 2011, Texas RHH had a system in place to meet the HHCAHPS requirement and the 2% deduction was released.

Brady said that she was not upset when the LOI expired because she had set up a meeting with another buyer for the first of the year and "knew [the IRS] would just go ahead and implement the installment agreement." Hammond contacted Brady directly because Maxus had "a lot of time and money invested in this deal and the financials looked fantastic and it was worth pursuing." When he asked Brady what they could do to get the deal done, she told him that she wanted "four times [her November] EBITDA."

Angie and Anderson told Hammond that $8.8 million was a good deal based on the most recent financials, which Angie said showed Texas RHH "seemed to be on a good growth track. . . . [T]heir net profit and revenue seemed to be increasing and their profit margin was really high for the industry, so it looked to be a strong company."[43]

On December 26, Angie, Hammond, and Anderson for Maxus met with Brady and her attorneys and went through the APA line by line. No one from Texas RHH mentioned the outstanding federal tax liability, lien, or levy during the meeting or said that they could not or would not make a representation about the truth, completeness, or accuracy of the financial information that Maxus had been given. Hammer did not recall any discussion of the Zera provider number.

---

[43]The retained earnings from 2010 to 2012 that Furtek sent Brady were different from what Brady gave Maxus for the same time periods. Brady testified that she did not know which set of numbers was accurate because she did not know how to calculate retained earnings.

31

Hammer said that Maxus had expressly chosen to proceed without counsel at the meeting, but Hammond said that Hammer had agreed to "just answer whatever questions [Maxus] ha[d]" and never told him that Maxus needed to retain separate counsel. Angie said that she did not think that she needed a lawyer to review the draft APA because she had been involved in similar agreements when she had worked for FMS, and Hammond agreed. Hammond acknowledged the transaction's size but said that he did not think Maxus needed an attorney because they "were under the impression that Bryon Hammer was hired to ink the deal and once we agreed on terms, he would paper it."

The APA required Maxus to pay $6 million by wire transfer and to execute a $2.8 million promissory note. On December 31, at 2:36 p.m., Brady sent an email with wiring instructions. Brady acknowledged that when she sent the email, Texas RHH had still owed $3 million to the IRS. Brady went to the IRS office that afternoon before anyone signed the APA, gave the IRS a certified check,[44] and received a certificate of release of federal tax lien; Hammer learned later that day that Brady had used the money that Maxus had wired, but he did not tell Maxus because "[t]hey weren't [his] client."

## H. Other Agreements and the APA's Post-Closing Deliverables

---

[44]Texas RHH's December 31 bank record shows that on the same day that Maxus wired in the purchase money, $3,091,445.19 was transferred out. The IRS's certificate of release of lien was filed for record in Tarrant County on January 18, 2013.

32

The parties executed other agreements in conjunction with the APA and agreed to several post-closing deliverables.

One of the agreements was between Maxus and Brady, on behalf of Zera, for Maxus to manage and operate all aspects of Zera d/b/a Renew Home Health in exchange for all of Zera's revenues. Mertz said that because the Zera provider number was not a sellable asset at the time of the APA's execution, the parties had entered the management agreement as a placeholder until it could be transferred. The agreement's initial term was for a year starting January 1, 2013, with automatic renewal for additional one-year terms unless Maxus opted to cancel it upon 30 days' written notice or "at any time after January 1, 2016, if either party elect[ed] to cancel this Agreement by giving at least thirty (30) days['] written notice to the other party."[45] Anderson told Angie the night before the parties executed the management agreement that it was fine, even though it provided that Brady could terminate it in 2016, because he anticipated that Maxus would have the change of ownership for the Zera provider number done "long before then."

Maxus signed leases with BP Chaney for the Renew Home Health offices in Fort Worth and in Granbury. And APA Section 1.11 provided that after closing, and "as soon as such records and documents [were] reasonably available to Seller," Brady

---

[45]Brady terminated the Zera agreement on December 30, 2015, and said that Maxus was "just mad that [she] didn't give 30 days' notice."

would provide copies of or make available to Maxus the following: her bank statements for the deposit accounts for December 2012; her 2012 Medicare cost report; her unaudited balance sheets for end-of-year 2012; her 2006, 2007, 2008, and 2009 Medicare cost reports; her final 2012 federal tax returns; her "current QuickBooks database file related to the Business"; and her current DADS license.

## I. The Parties' Post-APA Relationship

With Brady's help, the transition that began in January 2013 went smoothly. Lindsey Muncy, a former Renew Home Health employee,[46] said that during the transition, Brady was frequently in the building and attended company meetings, giving advice to Angie. Anderson cited as an example an occasion when Maxus missed a payroll deadline, and Brady's husband transferred money into Maxus's account to help keep everything "seamless [for] the employees." But Angie said that while Brady was initially helpful during the transition, she became less so when Maxus kept asking for the financial information and for Texas RHH's QuickBooks files, which had been listed as post-closing deliverables.

After Brady left Maxus in June 2013, the parties' relationship began to sour as Maxus became aware of Texas RHH and Zera's tax problems, and Brady became increasingly uncommunicative and uncooperative.

### 1. Texas RHH and Zera's Tax Liability and Zera Purchase Agreement

---

[46]Maxus fired Muncy for cause.

34

At about the same time that Maxus and Brady began working on the Zera purchase agreement in the summer of 2014, Maxus discovered that Zera had a tax problem and discovered Texas RHH's tax history.[47] The parties disputed how much consideration was required in the Zera purchase agreement and whether Zera was within the APA's terms and purchase price. Brady complained that in July 2014, Maxus had become "really aggressive about the Zera purchase agreement, and then they started vandalizing" the Fort Worth property leased from BP Chaney.[48]

### a. Consideration

Angie's draft purchase agreement, which she had sent to Brady and Hammer in July 2014, stated, with regard to consideration, "Buyer hereby purchases from Seller all the Assets of the Business in exchange for $100 in hand paid and other valuable consideration, the receipt and adequacy of which is hereby acknowledged by Seller."[49]

---

[47]On April 8, 2013, the IRS sent Texas RHH a notice of intent to levy $16,659.60, but Maxus did not become aware of Texas RHH's and Zera's tax problems until 2014. On January 30, 2015, Brady paid $16,900 to the IRS for a civil penalty liability for Texas RHH for tax year 2011, three years after Brady had represented, in executing the APA, that there were no unpaid taxes. Brady claimed that this did not breach the APA because she had disputed owing it and had only paid it because she was tired of arguing with the IRS. Brady said that the IRS later agreed that she had filed the form for which the penalty for nonfiling was assessed.

[48]Brady claimed that Maxus had disabled the property's security system and had cut the lock on the roof hatch. Hammond said that after getting no response to repeated requests for Brady to fix the roof, he finally gave a roofer permission to cut the lock in order to get the repairs done.

[49]Hammer said that under this language, there would not be any additional money paid beyond the referenced $100.

35

Brady said that she did not know what "in hand paid" meant and that, at some point, she would have put in the purchase price that she thought Maxus should pay above and beyond the $8.8 million APA price,[50] even though she acknowledged that she had never told Hammond that the Zera provider number was not part of the $8.8 million deal. Brady said that between December 15, when the LOI expired, and December 31, when the parties executed the APA, the only discussion that she remembered was that the parties would enter a management agreement and that "at some point[, they] would enter a purchase agreement for Zera, Inc., but [they] didn't discuss the terms of that" nor the price for Zera's provider number.[51]

Angie said that the draft listed $100 as nominal consideration because the Zera provider number's purchase price had been part of the APA's $8.8 million and that prior to the lawsuit, no one had ever said that Maxus was going to have to pay anything more than nominal consideration. According to Angie, Zera's provider

---

[50]Brady said that Zera's market value had been $1.5 million before Maxus had transferred away its patients, but she conceded that this amount was not mentioned in the November 2012 LOI or the parties' August 2014 email exchange about the Zera purchase agreement. Brady opined that, at the time of the trial, Zera's value was either zero, because of the lack of patients, or negative, because the Office of the Inspector General had opened an audit, which she attributed to Maxus's mismanagement.

[51]Anderson's understanding was the same as Brady's—that Maxus was not supposed to acquire Zera in the APA because of the 36-month rule—and he said that there was no confusion during due diligence.

36

number was worth $250,000[52] and was sold to Maxus under the APA, but Maxus and Texas RHH still had to "paper the purchase" to transfer it after January 2014 under the 36-month rule, at which time the transfer would be reported to CMS. Angie stated, "It was represented as one big company[,] and we paid for it as one big company."

Hammond agreed with Angie, stating that the Zera provider number and Zera's revenue and assets were used by Texas RHH historically in the operation of its business. And Mertz testified that he understood from his conversations with Brady and from reading the APA that the Granbury location was included and that, subject to the expiration of the 36-month rule, the Zera provider number would be included as part of the APA with no additional payment above what was outlined in the APA.

The APA's "acquired permits" that were "assignable or otherwise transferable . . . to Buyer under the applicable Legal Requirements" listed only Texas RHH's provider number. Angie said that the goodwill amount listed for the assets—$8,458,997—included Zera's assets and provider number. Brady, however, pointed out that Schedule 1.2(c), entitled "Purchase Price Allocations," did not list Zera's provider number or assets.

---

[52]Brady said that a DFW provider number was worth about $250,000 with no patients and without the problems currently associated with the Zera provider number.

Schedule 1.2(c) lists marketing supplies, medical supplies, and office supplies as "Class IV" items worth $8,600. It lists vehicles and furniture, fixtures, and equipment as "Class V" items (referred to by Hammond as the "hard assets") worth $232,423. And it lists the noncompete covenant and goodwill as "Class VI and VII items"; the noncompete covenant's price allocation was $100,000. Goodwill absorbed the remainder of the $8.8 million purchase price, listed as $8,458,977. Hammond testified that the goodwill covered everything in the APA, including Zera's assets: "the relationships with employees, the relationships with referral sources, the relationships with patients, the cooperation of the former owner [Brady], the contracts that previously were under Texas RHH and the hard assets, the trademark, trade name, intangible assets, software systems, [and] stuff like that." The certificates of title for two of the seven vehicles listed in the APA schedules show that they were owned by Zera, and Brady agreed that they were used in the operation of the business.

Angie claimed that the Zera provider number also fell under the APA's "other necessary assets" clause and that Brady had no reason to try to hold onto it because of her noncompete agreement.[53]

**b. Zera's Promise**

Hammer returned the Zera purchase agreement draft to Angie in August 2014 and noted in his correspondence with her that Brady was working to resolve Zera's

---

[53]The jury found no breach by Brady of the APA's noncompete clause.

unpaid tax issue, which had resulted in a levy "prior to the closing." Brady agreed that resolving Zera's IRS levy was part of the purchase agreement's hold up.

On September 11, 2014, Angie emailed Brady and copied Hammer to ask if they had a timeline for the purchase agreement. Hammer replied that Brady was still working on the IRS recoupments issue. In her response to Hammer's email, Angie set forth her understanding that Maxus was indemnified under the APA for Zera's liabilities that had occurred prior to the APA's closing and asked how much Maxus should hold back from the next APA payment. Angie emphasized that the Zera sale had been important to Maxus—"an integral part of the overall deal"—and asked again for a timeline for finalizing the Zera purchase agreement.

Hammer, copying Brady, replied that the Texas RHH and Zera transactions were separate, that Maxus had no right to withhold any of the Zera recoupment amounts from the Texas RHH note payment, and that none of the purchase price under the APA was allocated to the Zera acquisition. He stated, in pertinent part,

> Zera, Inc. is a separate entity with a separate Medicare Provider Number. None of the representations and warranties or corresponding indemnity rights under the APA involve or refer to Zera, Inc. In fact, Zera, Inc. is only mentioned in two provisions: Section 4.15,[54] which requires Maxus to enter into a Management Agreement with Zera, Inc. and

---

[54]Before the APA was executed, Angie sent Hammer an email, copying Brady, to ask, "Should the [Zera] license number be listed under 2.7(a) Acquired Seller Permits?" Hammer replied a few minutes later, stating, "No[,] that number is not owned by Seller. It is covered under the Management Agreement that is in Section 4.15." Angie testified that in light of Hammer's response, she thought APA Section 4.15 solved the 36-month rule problem.

specifies that the parties will execute a purchase agreement after January 19, 2014; and Section 2.12(g),[55] which mentions Zera, Inc. in the context of the 36-month rule. As such, the parties' rights or remedies with respect to these recoupments are governed by the terms of the Management Agreement, which is the only existing contract between Zera, Inc. and Maxus.

We also do not agree that the Zera, Inc. transaction was an integral part of the overall deal. As noted above, the APA treats Zera, Inc. as more of an afterthought, and it is worth noting that none of the purchase price is allocated to the Zera, Inc. acquisition. *That said, Zera, Inc. still fully intends to execute an asset purchase agreement as contemplated by Section 4.15.* As I have previously stated, there is not any timeline for doing so in the APA other than that it will not be before January 19, 2014, but I believe that all parties will want the issue with the IRS resolved first. [Emphasis added.]

Angie said that prior to Maxus's receiving notice from the IRS of Zera's tax deficiency in the summer of 2014, Brady had never told Maxus that there were unpaid taxes owed by Zera, that the IRS recoupment constituted a breach of the management agreement, and that the IRS ultimately retained $92,800 from revenues that were

---

[55]Section 2.12(g), entitled "36-Month Rule," states that Texas RHH became certified by CMS as a home health agency in April 2006, had been continuously enrolled and certified as a Medicare home health provider since then, and

> [e]xcept for Seller's Granbury location provider number [xx-xxxx], Seller has not had a "change in majority ownership" (as defined in 42 C.F.R. 424.502, as amended) or any other event or transaction within the 36-month period immediately preceding the Closing Date that would require Buyer pursuant to the 36-Month Rule (as defined below) to enroll in Medicare as an initial applicant as a result of the consummation of the transactions contemplated by this Agreement and the other Acquisition Documents. As used in this Agreement, the term "36-Month Rule" means 42 C.F.R. 424.550(b), as amended, and other Legal Requirements in effect on the Closing Date.

supposed to go to Maxus. Maxus also sent Zera an invoice in February 2016 for "fees for services rendered under management agreement" for $23,112.83, which was the amount of Maxus's money that remained in a Zera bank account when Brady terminated the management agreement. Brady agreed that she had not paid that invoice.

Brady agreed that none of the financials provided to Maxus showed that Zera had unpaid taxes but said that her first notice of the tax levy had been when Angie brought it to her attention. She acknowledged that the recoupments should have gone to Maxus under the management agreement but claimed an offset because Maxus "stole" Zera's patients and "caused a lot of [Medicare] recoupments" to be owed. Brady also said that she had paid over $60,000 to stop the levies.

**2. Email System**

In October 2014, Maxus contacted its email hosting service, Hostway Global Web Solutions, about a problem with the email system. Hostway told Maxus that Brady had taken over Maxus's email "through a control number that [Maxus] didn't know existed." Angie stated that other than sending and receiving email, Maxus could not add or delete employees or change passwords and that Brady "had full access to all of [Maxus's] email and had changed all of the billing information, all [of] the account information that [Maxus] had set up" with Hostway.

Maxus sent Brady a cease-and-desist letter, complaining that it had been locked out of the email service for five days and would take legal action if Brady did not

change the contact information on the account back to Maxus. In a follow-up letter, Maxus reminded Brady that in February 2014, she had directed Maxus to pay Hostway for the email service, and Maxus demanded that Brady provide written proof to Hostway that she had transferred the email system's ownership and exclusive control to Maxus.

Brady did not change the contact information back to Maxus but eventually relinquished her grip on the email system's security controls. Maxus paid "around $9,000" to obtain a new email system and server and filed suit.[56]

### 3. Zera Patient Transfer

Between February and April 2015, Maxus transferred Zera's patients to Maxus's provider number.[57] Maxus presented two theories to support the transfer—that the parties had intended for it to occur and that an emergency caused by Brady required it.

### a. Parties' Intent

Before the APA's execution on December 31, Brady told Angie in an email that Zera's Kinnser license would remain active "until we get all of the patients transferred

---

[56]On December 30, 2014, Maxus and Texas RHH entered an escrow agreement for the APA's balloon payment and disputed note adjustment amount pending resolution of the parties' disputes.

[57]Brady accused Maxus of violating the management agreement, but the jury found no breach by Maxus, no fiduciary duty owed by Maxus to Zera, no fraud by Maxus, and no conversion by Maxus of Zera's property.

to the Renew [Fort Worth] # which will take about 60 days." Angie said that the patients were not transferred within those first 60 days because they were waiting for the DADS license and there was no deadline. Angie stated that because Maxus was to receive all of the revenue from treating patients under the management agreement, it did not matter, in terms of revenue, which provider number the patients were under.

While Angie testified that the parties' plan had always been to transfer the patients, Anderson insisted that because of Medicare regulations, everyone knew that Maxus would have to buy Zera before the patient transfer could occur, but he agreed that Brady's December 2012 email was inconsistent with his understanding. Courtney Smith, who had worked for Renew Home Health in the Granbury office, said that around mid-January 2015, the staff were told that the transfer was so that all of the patients would be in one Kinnser account. Muncy said that Maxus's director of nursing told her not to tell Brady about the patient transfer, but Angie denied that Maxus had hidden it from Brady or that she had directed anyone not to tell Brady about it.

### b. Emergency

According to Maxus, a lack of communication between the parties about the renewal of Zera's DADS license also prompted the patient transfer.

On December 22, 2014, Maxus's attorney followed up with Brady and Hammer on Zera's DADS license renewal to express Maxus's concern that the license could expire on February 28 if the application were not filed by January 14, 2015. In

her letter, Maxus's attorney raised the possibility that Zera's unpaid tax lien could impede the license's renewal. Angie said that she had decided to transfer the patients after Brady had failed to confirm by early February that she was going to timely file the renewal.

Hammond said that the transfer was for the protection of patients who were going to be Maxus's as soon as Zera's tax problems were resolved and the Zera provider number was transferred. Hammond also explained Maxus's concerns that Brady might try to sabotage the company by not filing the renewal, citing her lack of cooperation and communication and her interference,[58] and stated,

> So if that provider number had lapsed with 80 or 90 patients on it, then we would have had to stop caring for those patients immediately, so we had to do something to protect the patients, and it's my understanding that they put an emergency plan in place and started discharging the patients under that provider number and -- and readmitting them under the [Maxus] provider number.
>
> And we did it on [an] emergency basis because they wouldn't communicate with us, but it shouldn't matter anyway[] because if they [had] renewed it, that means that they had to get the tax lien resolved and if they got the tax lien resolved, the last statement they made to us is that they would sign over the provider number as soon as they got that done.

In a February 5, 2015 letter to Hammer, Maxus's attorney referenced her communications in the prior three months about the Zera DADS license renewal and

---

[58]Hammond said that around the time that Brady had refused to accept a rent check so that BP Chaney could terminate the Fort Worth lease, she had manipulated the building's wi-fi controlled thermostats.

44

noted that to date, Brady, as Zera's sole member and president, had refused to sign it. She referred Hammer to the DADS licensing standards handbook to support her argument that failing to file the application by the license expiration date would "cause Zera to lose its legal authority to provide home health[]care services in Texas," causing patients to lose their care and providers to lose payment for services provided after the license's expiration date, and reminded Hammer that Zera's tax lien could prevent the application renewal's approval. She also reminded Hammer about Maxus's position on Zera with regard to the APA and management agreement, as follows:

> The existence of the tax lien and continued failure by your client to resolve the tax obligations of Zera is obviously a serious and significant issue for Maxus, who entered into the [APA] and Management Agreement with the understanding that all of the revenues of Zera while under the management of Maxus would be received by Maxus, and no revenue would be usurped under a tax levy for failure of Zera to pay taxes on operations prior to the December 31, 2012 closing date. (Management Agreement, Par. 3(a)). Maxus contracted to acquire, free and clear, the assets of Zera and manage the assets of Zera until such time as the provider number and license for Zera could be acquired as evidenced by an executed purchase agreement that all parties agreed would occur within several months of the three[-]year anniversary of the Medicare Provider enrollment of Zera on January 19, 2011. Further, Mr. Hammer has stated that the reason the provider number has not already been transferred is the fact that the lien remains outstanding and [that] Ms. Brady wants the issue resolved first. The fact is that the parties should not even be debating the renewal and lien issues because Zera should long ago have executed the purchase agreement transferring [the] remaining assets to Maxus.

Four days later, Hammer replied that it was his understanding that Brady had timely executed and submitted the renewal application and fee to DADS and that her

45

check had cleared on January 22, 2015. Hammer also stated that Brady had paid the full amount of the Zera tax lien although "her position remain[ed] that there [was] not any amount that [was] actually owed." And he stated that Maxus was not authorized by the management agreement to transfer Zera's patients, that such an action was "prohibited by law,"[59] and that Maxus should immediately stop if it was transferring the patients.

Brady denied that the license renewal had been an emergency, claiming that late filing would result only in a late fee. She said that she had let Maxus know that the application was timely filed and that she had verified its processing with DADS. Angie said that by the time that Maxus had learned that Zera's license had been renewed, it had already transferred a significant number of patients; Maxus then continued to transfer patients.

## J. Profitability—Net Income and Revenue

With regard to the assets' performance indicators, Angie and Hammond focused on net income while Brady and Anderson focused on revenue.

Angie and Hammond both said that in 2013, when Maxus took over Texas RHH's assets, Maxus did not see the growth rate in net income that had been represented in Texas RHH's financial statements. Hammond described the business's

---

[59]When referred back to the parties' December 31, 2012 email, Hammer acknowledged that he knew that the plan had been to transfer patients from the Zera provider number and that he "would have assumed it would have been done in accordance with whatever the legal requirements are."

performance in 2013 as "[p]retty disappointing." Angie said that in 2013, net income went down 44% if Caring Hearts's contribution was not counted. She compared Texas RHH's net income numbers in 2010, 2011, and 2012 as provided to Maxus and applied Maxus's expenses in 2013 but acknowledged that Texas RHH's expenses had been lower than Maxus's and that Maxus's higher expenses had also affected its net income numbers.[60]

Brady said that in January 2013, right after the APA was executed, Caring Hearts's Medicare funds had been shut off for incorrect cost report filing, so Maxus had no revenue for parts of January and February other than that from Texas RHH's assets. Nonetheless, she said that Maxus's revenue in 2013 had been sufficient to make all of its payments to her, to pay Hammond his $25,000 monthly consulting fee, and to pay off the Caring Hearts note. Brady described the Maxus team as having been "really happy" and "really excited" about 2013's revenue and said that they had never complained to her about how any of the assets performed or told her that they did not experience the growth they had expected prior to the APA's execution.

---

[60]Maxus maintained the same employees, contacts, and referrals but paid one of Hammond's related companies $300,000 in 2013 and $597,095 in 2014 for accounting, financial, legal, and consulting services. Maxus also paid different salaries and bonuses.

Anderson testified that 2013 had been a good year for Maxus because money had been flowing.[61]

Angie said that in 2013, Maxus had just under $13 million in revenue but that an outside audit revealed a $700,000 overstatement. Hammond explained that there had been an accounting error in which accounts receivable were double-booked—making it appear that the company's financial performance was much better than it actually had been—and the auditors did not catch the error until 2014. During cross-examination, Hammond acknowledged that Maxus's revenues in 2013 showed a 33% increase compared to Brady's revenues in 2012, "assuming . . . Brady's numbers [were] accurate." But he added that his impression was that Brady's numbers were not accurate, and he said that the EBITDA after the sale was significantly less than what Brady had represented in her financials.

Maxus's revenue in 2014 was approximately $14 million, and Angie attributed this improvement to Maxus's expansion of operations.

K. The Parties' Disputes

The parties disputed the relevance of the tax debt with regard to the APA purchase price, what assets had been sold, whether certain APA provisions had been

_____

[61]Anderson said that Maxus was able to pay off the $300,000 it owed to Hammond for Caring Hearts as well as the payments owed to Brady under the APA while still keeping around $1 million in the bank as a reserve "because Medicare can have a glitch in the system and cut off your payments for two weeks."

breached, and whether the APA included the transfer of Zera's provider number. The parties also disputed certain issues regarding the Maxus–BP Chaney leases.[62]

### 1. "Net Debt and Notes Payable" Line Item

Furtek stated that without the penalties and interest, the "Net Debt" line item was understated and inaccurate and that it had been Brady's decision, made in consultation with him, to put the payroll taxes in the "Net Debt" line item and to leave out the penalties and interest. Brady denied that they had consulted on putting the unpaid tax liability in the "Net Debt and Notes Payable" line item or that she even knew what "Net Debt and Notes Payable" meant.

Carradine, Maxus's forensic consultant,[63] said that nothing in the "Net Debt and Notes Payable" line item showed any unpaid tax liability: "By looking at the face of the balance sheet, you would never know that [the tax liability] was in there." Carradine said that as a CPA, if she were asked to account for the interest and penalties on the balance sheet created by Furtek, she would have recorded it as a separate line item under "Current Operating Liabilities" (which she said "should really say 'Current Liabilities'") and that it should be the first line item because it was the

---

[62]The jury found that Maxus had not been overcharged under the leases, that Maxus had ratified the leases, and that Maxus had not failed to comply with the leases. Maxus did not submit any questions to the jury about whether BP Chaney had breached the leases.

[63]Carradine testified that she was a licensed CPA with over 25 years' experience in auditing and preparing financial statements.

largest dollar amount. Carradine further stated that she would have combined the interest and penalties with the unpaid payroll taxes; would have named the line item "payroll taxes, penalties and interest"; and would have put the $3 million amount under "current liabilities."

## 2. Texas RHH's Financial Standing Before the APA Was Executed

Mertz said that he could not reconcile Texas RHH and Brady's sworn statement to the IRS about significant operating losses with the financial statements given to Maxus and said that if he had known about the losses, he would have asked more questions about the financials that Brady had given him.

The tax liability had an effect on Texas RHH's current ratio in that, if the $3 million liability had been properly booked as a current liability, the current ratio would have shown roughly twice as many liabilities as assets, reflecting what Angie characterized as "an insolvent company that couldn't pay its bills." Hammond said that the current ratio had been an important factor in his decision to make an offer for Texas RHH's assets and that current assets ($1,745,000) divided by current liabilities ($435,000), as shown in the financials Maxus was given, produced a roughly 4-to-1 ratio without the tax liability.

When asked what he would have done if the balance sheet had shown an asset-to-liability ratio of .52-to-1 instead of 4-to-1, Hammond said that he "would have done everything differently" because that ratio would indicate that the company was in financial trouble. Hammond said that under those circumstances, it would have

50

been hard to tell how much cash would have been needed to sustain the business and that Maxus would have needed to examine whether the cash losses were driven by bad management, overspending, or something else. He said that he would not have agreed to pay much for a virtually bankrupt company; that if Maxus had been told from the outset about the $3 million liability for unpaid taxes, penalties, and interest, it would have done its due diligence "in a very different way" because the past-due taxes "mean[t] that this operator [was] a really bad operator"; and that he would have expected the unpaid taxes, lien, and levy to have been disclosed during due diligence. If Brady had disclosed the tax liabilities and reliable financials, Hammond would have been willing to pay only $4 to $5 million for Texas RHH's assets.

Mike Hill, Maxus's damages expert,[64] opined that Texas RHH had been in distress because "anyone that has an unpaid tax liability that goes back a number of years and can't pay it is in distress." Lisa said that once a taxpayer falls behind in paying taxes, the penalties and interest can become very punitive, making it hard for the business owner to turn the business around and sometimes leading to a distressed sale—i.e., when liabilities exceed assets—which would not fetch a premium price. And Furtek agreed that it would have been important to a buyer to have known about the payroll taxes with regard to Texas RHH's historical operations and how it had performed relative to their existence. He said that, for example, when buying a

---

[64]Hill testified that he was an accredited senior appraiser.

company's assets, a buyer would want to know if the company was being funded on its own, through a loan, or by not paying its payroll taxes.

Brady said that no one had ever talked to her about the current asset-to-liability ratio and that Maxus had been focused on revenue and on the general expenses it would have going forward. But she acknowledged that she did not give Maxus all of the information that she had given the IRS.

### 3. APA Terms and Contents

The parties disputed whether the APA included the Zera provider number,[65] Zera's Kinnser software and ZirMed account, Texas RHH's QuickBooks software, and the email system, among other items.[66] While Zera was not a party to the APA and its provider number and Kinnser software account were not listed on the APA's schedules, some of Zera's assets and contracts were listed, including Zera's ZirMed account.

#### a. "Acquired Assets"

Hammer explained that there are two types of asset purchase agreements: "Some of them say that, 'I'm buying all of the assets of the seller unless they're

---

[65]We set out the parties' dispute over Zera's provider number in prior sections of this opinion.

[66]The jury found that Texas RHH had failed to comply with the APA by not transferring a Blue Cross Blue Shield contract and the "Renew Home Health" building signs, the trial court awarded specific performance for them, and Appellants do not appeal this part of the judgment.

specifically listed as excluded.'  And there are other types of asset purchase agreements that say, 'I am buying this list of assets[,] and if it's not on the list, I'm not buying it.'"  Hammer said that the APA was the second type, meaning that an item had to be listed to be included in the purchase.  Brady complained that there were mistakes in the schedules, which Hammer had prepared, because they contained some of Zera's contracts and vehicles.

The APA's recitals listed that Texas RHH was selling "substantially all of the assets, rights[,] and properties owned, held[,] or used by [it] relating to the Business [defined in the APA as the business of furnishing home health services through licensed and certified parent and branch agencies] which assets are specified herein."  Section 1.1(a) introduced the "Acquired Assets," stating,

> Upon the terms and subject to the conditions in this Agreement, Buyer will purchase, assume[,] and receive from Seller, and Seller will sell, assign, transfer, convey[,] and deliver to Buyer, free and clear of all Liens (as defined in **Section 7.1[8]**),[67] all right, title, interest[,] and benefit in and to all of the assets, rights[,] and properties of Seller expressly listed in this **Section 1.1(a)** as they exist at the Closing (as defined in Section 1.4(a) below) (collectively, the "***Acquired Assets***"), but specifically excluding the Excluded Assets (as defined in **Section 1.1(d)** below).

---

[67]Section 7.18 defined "Liens" to include all types of liens and "Liabilities," defined "Liabilities" to include "without limitation, any liability for Taxes," and defined "Taxes" as "[a]ny . . . payroll . . . or other tax of any kind whatsoever, including any interest, penalty[,] or other addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the tax liability of any other person."

Section 1.1(a) contained thirteen categories, some of which had schedules itemizing property. Section 1.1(a)(iii), labeled "Acquired Personal Property," for example, listed four pages of assets in its corresponding schedule.[68] Section 1.1(a)(ix) defined "acquired intellectual property" as "[a]ll license agreements, copyrights, trademarks, trade names (including the name 'Renew Home Health,' and any derivatives thereof), service marks, internet domain names and websites and computer software used by Seller relating to the Business."

Section 1.1(d), labeled "Excluded Assets," stated that the "Acquired Assets" would not include "any asset of Seller not expressly listed in **Section 1.1(a)** along with any of the following assets, rights[,] or properties of Seller (collectively, the '***Excluded Assets***')." Section 1.1(d) listed nine subsections, but subsection (ix), labeled "Scheduled Excluded Assets," listed no assets on its schedule.

Contradicting the emphasis on expressly listing the acquired assets found in other areas of the APA, the "Other Necessary Assets" paragraph in Section 1.1(a)(xiii) and Section 2.26, labeled "Sufficiency," supported Maxus's broad interpretation of the APA. Section 2.26 contains Texas RHH's representation that "[t]he Acquired Assets constitute all the properties, assets, and rights as are necessary for the conduct of the

---

[68]Schedule 1.1(a)(iii) listed all of the tangible property used in the Fort Worth, Abilene, Breckenridge, Mineral Wells, and Granbury offices, as well as seven company vehicles.

Business as conducted by the Seller in accordance with its historical operations on or prior to the Closing Date." And Section 1.1(a)(xiii) defines as an acquired asset

> [a]ny other privileges, rights, interests, Contracts, properties and/or assets of Seller (other than the Excluded Assets) relating to the Business which are necessary to continue conducting operations of the Business following the Closing Date in substantially the same manner as Seller historically conducted its operations prior to the Closing Date.

Angie said that Section 1.1(a)(xiii)'s "other necessary assets" clause was included to make sure that Maxus had everything it needed to run the company in the same way that it had been run before the sale because some assets did not get listed in the schedules. And Hammond testified that the clause was included because he knew that Texas RHH had a lot of moving parts and separate offices and because the deal was put together quickly.

Brady said that she did not know what "other necessary assets" meant, insisted that she had sold only the assets expressly listed in the APA and schedules, and stated that the parties had reached a "very, very clear understanding" that she had wanted to sell only what was listed. Brady complained, "I didn't know that later on -- and I do feel like this [was] a trick -- that they were going to come back and try to use this as a claim to say [that] they [had] bought everything in the business."

Brady testified that she had given Maxus everything that was specified in the APA, and she referred the jury to the APA's merger clause. Anderson agreed with Brady's characterization, stating that if something was not listed in the schedules or explicitly stated in the APA, Maxus did not think it was buying it. He further stated

55

that Maxus had not thought that it was acquiring any of Zera's assets because of the 36-month rule.

### (1) Zera's Kinnser software

Before the APA's execution, Angie sent Brady an email that day to ask whether Maxus would "assume the Kinnser software license for the Granbury office," and Brady responded, "Yes, you will assume the software license for Kinnser.[69] It will have to remain completely active until we get all of the patients transferred to the Renew # which will take about 60 days."

Angie testified that Maxus had acquired Zera's Kinnser software license agreement under the APA because it was used in historical operations; that Brady had confirmed it in her email; and that when Brady terminated the Zera management agreement, she had locked Maxus out of the Zera Kinnser system.

Brady argued that Texas RHH had not owned Zera's Kinnser software and therefore could not have sold it. Anderson agreed with Brady and said that Maxus had taken steps to transfer Texas RHH's Kinnser software to Maxus but did not take the same steps regarding Zera's Kinnser software "because we were just paying for it as the management company to use it, but we didn't actually own it."

### (2) Zera's ZirMed account

---

[69]Brady said that regarding the Kinnser software license, she was "describing a process that would happen at a future date when [Maxus] would purchase the [Zera] provider number."

56

Angie testified that Maxus had been paying for and operating under the Zera ZirMed contract since acquiring Texas RHH's assets and that the contract was listed in APA Schedule 1.1(a)(viii). Brady had refused to transfer the account, asserting that Zera's ZirMed account should not have been included. The ZirMed subscriber agreements that Brady had signed on Zera's behalf on May 1, 2012, and October 16, 2012, were provided to Maxus during due diligence, along with a document entitled "Billing Services," which stated that Renew Home Health had used ZirMed for all locations.

Brady said that the ZirMed contract was Zera's and had been provided during due diligence only for informational purposes because the list that Maxus had given her "wanted to know how [Texas RHH was] currently operating." Brady asserted that "it was never intended for Maxus to buy any contracts of Zera." Anderson agreed with Brady and said that including Zera's ZirMed contract on the APA's schedule was a mistake "because there shouldn't have been any Zera contracts in there."[70]

### (3) Texas RHH's QuickBooks software

At trial, Maxus argued that it had been entitled to Texas RHH's QuickBooks software—not just Texas RHH's QuickBooks file[71]—because, under APA Section

---

[70]Two other Zera contracts were also listed in the APA's schedules.

[71]Angie said that on several different occasions, Maxus had asked Brady to deliver the QuickBooks file—a post-closing deliverable—but that Brady kept making excuses, saying first that she had commingled personal information that she wanted to extract and then that the files had been on a laptop that had fallen off a bed. When

1.1(a)(ix), it was "acquired intellectual property" that Texas RHH had used "relating to the Business." Brady acknowledged that Texas RHH had used the software to process payroll and accounts payable but disputed that it was related to the business of providing home health services. Brady denied that the reason she did not give the software to Maxus was because she did not want Maxus to see the millions of dollars in unpaid taxes; instead, she stated that she had "needed [the software] because [she] was still required to maintain the company of Texas RHH."

The parties disputed whether Maxus had planned to use Texas RHH's QuickBooks software. Angie claimed that Maxus had planned to use it for accounting and payroll because it would already have employee pay history and vendor information and could be "kind of plug and play." Brady, on the other hand, stated that her understanding had been that Maxus would purchase its own QuickBooks software at the beginning of January 2013 and use Hammond's other company for accounting services. Anderson supported Brady's testimony.

---

Angie offered to hook up the broken laptop to a monitor so that they could extract the information from the hard drive, Brady refused and "lost" the laptop. Angie said that Texas RHH's QuickBooks file would have shown the tax liabilities that were due.

Brady claimed that she had given Maxus Texas RHH's current QuickBooks file at the end of October or beginning of November 2013 in the form of a jump drive containing "every single transaction. It was thousands and thousands of pages" containing "every transaction of Texas RHH that pertained to this closing deliverable." But Angie said that what Brady had provided—in April 2014—was "a data dump, basically, of some of the file," in the form of five Excel spreadsheets containing thousands of pages but no backup.

Angie said that because Brady did not give them the QuickBooks software, Maxus had to buy a new QuickBooks system and start from scratch, which cost the company $32,000 in Angie's time and $31,000 for a consultant's time in getting the new QuickBooks system up and running. Hammond said that Brady's failure to deliver the QuickBooks software affected Maxus's operations during the first couple of years because all of Angie's time was consumed in recreating an accounting system from scratch.

### (4) Email system

Angie testified that the Hostway agreement for email services was a license agreement and involved computer software. Angie said that Brady's explanation for changing the security controls was that Maxus had not acquired that asset (the email system), even though it was the same email system that Maxus had taken over on January 1, 2013, and had been using until October 2014.

Brady said that Maxus had bought the domain name but not the email system or her historical emails—including personal emails—from 2006. She acknowledged that her interference with the email system had occurred around the same time that Maxus had discovered the Zera tax levy and the tax liability Texas RHH had accrued before the APA's execution, but she denied that she had changed the hosting system's passwords to cover up her emails with Furtek.

### b. "Effective time" and Sections 2.16 and 2.17

The parties disputed when Section 2.17's representations had become effective and whether Texas RHH had breached Sections 2.16 and 2.17. Section 1.4(a) of the APA stated that "[t]he transactions contemplated by this Agreement will be effective for Tax, accounting[,] and all other purposes as of 11:59 p.m. CST of the Closing Date (the "***Effective Time***"), except as provided otherwise in this Agreement or otherwise mutually agreed on in writing by the parties." Article II, entitled "Representations and Warranties of Seller," contains 28 subsections introduced by the following:

> Seller represents and warrants to Buyer that, to Seller's knowledge[72] (defined below) except as disclosed on the disclosure schedule attached to this Agreement, which is arranged in paragraphs corresponding to the numbered and lettered sections of this **Article II** (the "***Seller Disclosure Schedule***"), each of the following statements is true and accurate in all material respects on and as of the Closing Date.[73]

Section 2.16 states:

> **Financial Information.** Seller's unaudited income statements for the years ending December 31, 2010 and December 31, 2011; unaudited balance sheets for the eleven[-]month period from January 1, 2012 through November 30, 2012; and final federal income tax returns for 2006, 2007, 2008, 2009, 2010, and 2011 will be provided or made available to Buyer at or prior to Closing (the "Financial Information"). The Financial Information is true, complete[,] and accurate and presents fairly the results of the operations of Seller for the periods covered thereby. The books and records of Seller have been maintained in accordance with sound accounting principles, in effect from time to

---

[72]The APA defines "Seller's Knowledge" as "actual, personal knowledge of the Sole Shareholder, after reasonable investigation or inquiry."

[73]The APA defines "Closing Date" as December 31, 2012.

time, as consistently applied by Seller and properly reflect all the transactions of Seller.

And Section 2.17 states:

> **Taxes.** Seller has no overdue tax returns required to be filed with any federal, state, local, municipal, foreign[,] or other Governmental Authority[,] and Seller has no overdue Taxes, levies, assessments, tariffs, duties[,] or other fees imposed, assessed[,] or collected by any such Governmental Authority that may have become due and payable pursuant to those tax returns or otherwise. There are no unpaid Taxes related to the Acquired Assets. There are no current audits of Seller's federal and state income tax returns by the Internal Revenue Service or applicable state taxing Governmental Authorities. Seller has not received notice of any material deficiency assessment[74] with respect to or proposed adjustment of Seller's federal, state, local[,] or other tax returns. There is no Tax lien, whether imposed by any federal, state, local[,] or other taxing authority, outstanding against the Acquired Assets.

### (1) Testimony about Section 2.16

Angie and Anderson testified that Maxus had relied on the APA's representations and warranties regarding the financial information's accuracy because Maxus had relied on that information in calculating the purchase price. Angie said that the financial information that Brady had given Maxus in November 2012 was materially different from that which Brady had provided to the IRS, although Angie conceded that there is a difference between financial reporting and tax reporting. Angie said that Brady had never told Maxus that the financials were inaccurate before signing the APA.

---

[74]A "deficiency assessment" is a term of art describing "when the IRS issues an assessment based on an audit saying additional monies are owed."

Brady agreed that Maxus had reviewed and had relied on the financial information that she had sent, but she asserted that "Maxus was not . . . buying the financial health of the company." Brady said that as to the items referenced in Section 2.16, Furtek had prepared the unaudited income statement and unaudited balance sheets; that "whichever accountant [she] was using" at the time had prepared her federal income tax returns; and that she had given these to Maxus prior to closing. Brady agreed that she had signed off on the representation on behalf of Texas RHH and that it was incumbent upon her—not Furtek—to know that the financial information that she had provided to Maxus was true, complete, and accurate before signing her name. She claimed that the financial information had accurately and fairly presented Texas RHH's operations and the results therefrom.

Brady also complained that she had not known that her poor recordkeeping would be used against her and would not have made the representation in Section 2.16 if she had known that QuickBooks—Texas RHH's books and records—were included; she stated, "I didn't know that my QuickBooks was going to come back and be the basis of everything and used against me when I was upfront and forthcoming that they . . . were a mess. They were a mess. I mean, I've always been honest about that." Hammond said that if he had known that everything in Texas RHH's QuickBooks was a mess, "the P&L and balance sheet might as well be blank pieces of paper."

62

Brady also said that she had never hidden Texas RHH's financial condition and that she had told Maxus that the company had struggled, had experienced cash flow issues, and had incurred insufficient-fund bank charges. She pointed out that during due diligence, Anderson had used Firmex to access the 2009 tax return showing that Texas RHH had lost $259,980 that year and that at the end of November 2012, Bradley had reviewed the same information.

The following portion of dialogue between Brady and Maxus's counsel during trial is representative of several days' worth of testimony:

> Q. You don't know how [that "Net Debt and Notes Payable" number] was made up, but you signed in Section 2.16 that these financials were true, accurate, and complete.
>
> A. Yes.
>
> Q. You can't make that representation if you don't know how the numbers are made up; do you understand that?
>
> A. No.

And the next day, Maxus's counsel and Brady had the following colloquy:

> Q. And just so we're all clear, . . . there was absolutely nothing that forced you to make the representations and warranties that you made in that [APA]; is that right?
>
> A. Correct.
>
> Q. You voluntarily made those representations and warranties that were in the final draft, the final version of the [APA], right?
>
> A. Yes.

Q. And you knew that my client was going to rely on those representations and warranties, right?

A. I mean, I would assume. Yeah. Yes.

Q. That's why they're in there, right?

A. Yes.

Brady agreed that she had never provided to Maxus a single document that showed the $3 million in unpaid taxes, penalties, and interest but said that, at the time of closing, her representations were true. She said that she had relied on Furtek and her attorneys to make sure that the information in the representations was accurate, true, and complete. Brady also said that other than the noncompete, nonsolicitation, and indemnification provisions, she had signed the APA only in her capacity as Texas RHH's sole shareholder and had made no representations in her individual capacity.

Brown and Carradine testified that the financial information was not true, accurate, and complete because it did not identify the $3 million tax liability as a current liability but rather hid it in the "Net Debt and Notes Payable" line item, which Carradine said was incorrect and understated because it failed to account for almost $1.3 million in penalties and interest. Carradine explained that regarding the payroll tax liability, "[w]hat's important is that [Brady] didn't give [Maxus] that information," even after Furtek told her that a bank would want to see that information and that Maxus should be told.

64

Furtek acknowledged that because the balance sheet did not report penalties and interest, the "Net Debt" number was understated, making Texas RHH's financial operations look better than they really were, and Brown agreed that underreporting expenses would allow one to inflate a company's value. Furtek said that if Brady had testified that her QuickBooks were not accurate and were a mess, then she should not have represented and warranted that the financial information—which was derived in part from her QuickBooks—was true, complete, and accurate.

Carradine testified that Maxus had initially retained her to examine the financial statements that Texas RHH had provided to Maxus to determine whether the unpaid payroll taxes, penalties, and interest were shown. But when Maxus obtained the QuickBooks file and Furtek's work papers, Carradine uncovered so many errors that her task evolved into determining how the errors "related to the representations made by Texas RHH regarding the condition of the records." She agreed that her task became to try to recreate the books and records from Brady's QuickBooks file, Furtek's work papers, and the financial statements and documents that had been given to Maxus to reach a true and accurate picture of Texas RHH's financial condition prior to the APA's execution in 2012. Carradine said that she had been unable to determine to a degree of reasonable certainty what Texas RHH's profit-and-loss statement and balance sheet should have looked like if they had been accurate and complete because of missing records and inconsistent expense reporting.

Carradine said that Brady's emails to Mertz about her after-the-fact bank account balancing had shown that Brady's efforts were not sound accounting practices and confirmed that Brady had lacked source documents, such as vendor invoices or restaurant receipts, to detail what had been purchased and for what business purpose. Carradine said that she had uncovered improper bank reconciliation practices in connection with Brady's QuickBooks file. Carradine was able to trace some of the financial data that had made up net income in the balance sheets and had even made a correction that actually increased Texas RHH's net income in 2012 by $269,000. Carradine said that if Texas RHH's financial statements were not true, accurate, and complete and were not based on sound accounting principles, they called into question "everything, including the numbers that led down to EBITDA."

Carradine said that based on the state of Texas RHH's books, it was impossible to determine how Texas RHH's financial statement would have changed if the bank reconciliations had been properly performed. And Maxus was not given the opportunity to see the reconciliation discrepancies because they were "grouped in with a bunch of accounts called 'other G&A.'" Carradine said that as to the income statement that Maxus was given with 2012's "Expenses, Other G&A Expenses" in the amount of $669,610, she did not think that Maxus would have known about the $49,000 of reconciliation discrepancies in that line item, along with various other

66

expenses in the range of $40,000 or more that "were hidden by being grouped" in that line item.

Carradine also said that the fact that Brady had been appealing the IRS's denial of an abatement of the interest and penalties did not change the nature of the current liability for the taxes into a contingent liability and that when Brady had paid the tax liability on December 31 before she had executed the APA, this removed any question about whether the liability was contingent and whether it should have been recorded in the November 2012 financials, making those November 2012 financials no longer true, accurate, and complete.

### (2) Testimony about Section 2.17 and its "effective time"

Brown agreed with Maxus's counsel that the representations and warranties under APA Article II were to be true and accurate in all material respects on the closing date rather than to take effect at 11:59 p.m. on the closing date. Brady, on the other hand, contended that Section 2.17's effective time was at 11:59 p.m. on December 31, 2012, so that while that morning, Texas RHH had a tax debt without the ability to pay it off, by the time that she had signed the APA later that day, the debt had been paid.[75] Brady said that she had the certificate of release of lien "physically in [her] hand before [she] signed" the APA.

---

[75]Hammer said that besides the "effective time," "Seller's knowledge" would be the other qualification regarding whether Brady had breached Section 2.17, but he admitted that the tax liability notices had gone to Brady's Fort Worth address.

Hammer had prepared the "seller disclosure schedule," which listed "none" for Schedule 2.17 (Taxes), and he explained that "[t]he schedule [didn't] speak . . . until the [APA] ha[d] been signed." Hammer said that the plan was to schedule or otherwise disclose if the taxes were not paid by closing.

Angie said that Maxus had wanted Section 2.17's representations to make sure that everything was "up to par and up to regulatory standards and compliant with [the] IRS or any government agency," i.e., that it was "a clean company," and that the representations were material to Maxus's decision to proceed with the transaction. Angie said that Maxus did not think it would need to do any other independent research after Texas RHH represented in the APA that there were no overdue or unpaid taxes or levies and that if Maxus had known about the $2.7 million tax lien, it would not have agreed to pay $8.8 million.

Angie testified that Maxus had relied on Brady's representations in the APA that there were no unpaid taxes or liens and that her false representations had a negative effect on the company's valuation. Angie said that if Brady had told Maxus that the federal government had levied $1 million from Texas RHH's Medicare payments—which were attached to the Texas RHH provider number—that would "[a]bsolutely" have been a red flag, as would have been the millions in taxes, penalties, and interest that Brady had not disclosed.

Hammond agreed, stating that the representations about no unpaid taxes, levies, and liens were important to Maxus and that if Brady had been unwilling to

68

make those representations, it would have been a red flag, and Maxus would not have closed the deal. Hammond testified that Maxus had refused any as-is language "[b]ecause there had been a lot of representations about finances and performance, and [he] wanted to be sure that [Brady] was going to be accountable for those."

Brady agreed that Texas RHH's unpaid payroll taxes, penalties, and interest presented a substantial liability and that she could have—but did not—talk with anyone at Maxus about it before closing. And she acknowledged that Texas RHH had a state tax lien in addition to a federal tax lien and that the state tax lien was not released until November 7, 2014. But she asserted that because Maxus was not purchasing liabilities, it had no right to know about Texas RHH's payroll tax liabilities and that the Maxus team had told her and Mertz that "they didn't care what the liabilities were" and did not ask her about tax liabilities and liens. Brady further stated that Maxus "was provided all kinds of documentation that there was a tax lien in place" but acknowledged that she never gave Maxus the specific document that showed the multimillion-dollar tax lien or the IRS document showing the payoff amount. Brady pointed out that Bradley had identified to Angie the net operating losses that were listed on Brady's tax returns.

Hammer testified that he had known that Texas RHH had unpaid taxes in excess of a million dollars but had no idea about the IRS levies and would not have knowingly allowed a client to make a false representation. He knew that Maxus had wanted a representation and warranty from Texas RHH in the APA that at the closing

date no taxes were owed and conceded that it appeared that there had been overdue taxes, levies, and liens, which were contrary to Section 2.17's representations.

Hammer said that while Texas RHH could have deleted Section 2.17 during the drafting process, deleting that section would have raised a red flag because a buyer would want to know that there were no taxes owed. Hammer and Mertz agreed that owing $3 million in IRS taxes, penalties, and interest would be material information.[76]

Brown testified that if he were going to acquire a company or its assets, it would be material to him regarding whether that company was delinquent on its taxes. He said that to the extent there had been unpaid taxes, Maxus would have been on the hook for a levy attached to the provider number if Brady had not used Maxus's purchase money to pay off the tax liability. Brown said that if he had been asked to review the APA before Brady signed it, he would have insisted that she not make those representations because, in his professional opinion, they were false.

Hammer disagreed with Brown's testimony that Brady's representations in APA Section 2.17 were false, stating,

> I know Larry and he's a friend of mine and obviously I referred Ms. Brady to him, so as a tax controversies lawyer, if I have clients that are having issues with the [IRS], I wouldn't hesitate to refer clients to him. Mr. Brown refers clients to me . . . . I wouldn't believe that Mr. Brown

---

[76]Furtek acknowledged that if he were representing a buyer, he would want to know if a potential acquisition had been run such that it had an outstanding $3 million in unpaid taxes, penalties, and interest. Furtek also agreed there was no indication in the profit-and-loss statement that 15% of the Medicare revenue was being peeled off by an IRS levy to pay past-due taxes.

70

is qualified to give an opinion on that rep as to whether or not it was true or false, but if he said it was -- if he said the rep was false, then I would strongly disagree with him.

Anderson testified that the APA's representations and warranties did not replace Maxus's due diligence responsibility, but Brown said that a prospective buyer's due diligence is not an excuse for a seller to make false representations.

### c. Section 4.15

Section 4.15, labeled "Granbury Provider," stated,

> Buyer shall execute a "**Management Agreement**," as defined in this Agreement as management of all operational, patient care, financial[,] and any other business operational functions, with Zera, Inc., effective January 1, 2013[,] to manage and operate all aspects of Zera, Inc. d/b/a Renew Home Health that holds the Medicare provider xx-xxxx (the "***Granbury Provider***"). Such Management Agreement shall be in place until a purchase agreement for the Granbury Provider is executed between the Parties after the required third anniversary of the Medicare Provider enrollment of January 19, 2011.

Angie testified that Brady had breached Section 4.15 when she had failed to execute the Zera purchase agreement, and Hammond complained that prior to the lawsuit's filing, neither Brady nor Texas RHH had ever indicated to him that Zera had no obligation to sign the Zera purchase agreement because it was not a party to the APA.

Anderson testified that he worked on Section 4.15 because Maxus wanted to make sure that Zera's revenue—"another million-plus whatever dollars"[77]—was part

---

[77]Zera's average annual Medicare revenue from 2010 to 2012 was around $1.6 million and from 2013 to 2014, when managed by Maxus, was around $1.5 million. In

of the deal through the management agreement because Maxus could not acquire Zera's provider number in 2012 due to the 36-month rule and because the sale of the provider number had to be under a separate agreement. Anderson said that under the management agreement, Maxus would get all of Zera's revenue—part of Texas RHH's value to Maxus—for the three years before the provider number could be sold, and that after the three years, Maxus would have "first dibs on doing the purchase agreement" for the fair market value of Zera's provider number. Anderson stated that neither Angie nor Hammond ever told him that they thought that they had purchased Zera's provider number or any of its assets under the APA.

### 4. Other Post-Closing Deliverables

On April 11, 2013, Brady sent Furtek an email to ask about the APA's post-closing deliverable of "seller's unaudited balance sheets for year-end 2012" because Angie had asked her when they would be ready. Furtek responded with two emails. In the first, Furtek told Brady, "Attached are the December Financials. Note that the financials include the acquisition adjustments (cash, misc. expense, payroll taxes are negative?)[.] You may want to remove these before sharing with others." In the second email, which was sent a few minutes later, Furtek told Brady, "Attached is the full Excel model. You may not want to share since it contains all the old balance sheets." In the Excel model information, the "Net Debt and Notes Payable" still

---

2015, after Maxus transferred the patients, Zera's Medicare revenue dropped to $333,699.61.

listed some of the debts that Brady had claimed had been erroneous in prior financials.

Furtek's December 2012 financials that he had sent to Brady included information on the prior two years' worth of current assets and liabilities and showed the 2010 and 2011 payroll tax liability. Brady said that she did not recall whether she had followed Furtek's advice before forwarding the information to Maxus. When asked about whether Maxus would have known in April 2013 that Texas RHH had owed millions to the IRS prior to closing if Brady had given Maxus Furtek's information, Brady said, "I don't guess I ever thought about that."

### 5. Expert Testimony

#### a. Books and Records

Carradine testified that she had reviewed over 33,000 pages of documents in the case and opined that based on her review and her education, experience, and training, Texas RHH's books and records were so poor and contained so many errors and omissions[78] that she could not create a complete set of financial statements that accurately reflected Texas RHH's financial condition during the period before the APA was executed. She stated that she had reached the following professional opinions to a reasonable certainty:

---

[78]Brady claimed that approximately 200 boxes of records that included payroll records were stolen during a break-in and that only 117 boxes—patient records—were returned.

73

- Texas RHH did not keep its books and records in accordance with sound accounting practices.[79]

- Texas RHH's books and records did not properly reflect all of Texas RHH's transactions.[80]

- Texas RHH's financial statements were not true, accurate, or complete and did not fairly present Texas RHH's operations.

- Brady demonstrated a pattern of financial mismanagement.[81]

- Texas RHH's actions and representations made prior to the APA's execution contained objective indicia of fraud.

- Texas RHH's failure to keep its books and records in accordance with sound accounting principles caused Maxus to incur reasonable and necessary accounting services in the amount of $271,192.50.[82]

---

[79]Carradine opined that a business that engages in good basic accounting practices should be able to produce true, accurate, and complete financial statements.

[80]Carradine said that when she ran an audit trail report on the Texas RHH QuickBooks, it revealed "a tremendous number of transactions that were modified long after they were originally entered," which she said was a red flag that the books and records were not kept in accordance with sound accounting practices and that the resulting financial statements did not reflect all of the company's transactions.

[81]Carradine said that there were 335 cash disbursements or receipts—an aggregate of $1,077,334—not recorded in QuickBooks; at least 136 cash disbursements totaling $487,317 that were in QuickBooks but not in the bank statements; and 2,837 individual transactions that were recorded in 85 lump sums, meaning that QuickBooks did not have all the information about what those transactions were for or who the payee was. Carradine said that there were at least 24 entries totaling $134,696 that were recorded in QuickBooks and had the wrong names and amounts recorded, as well as "at least 4,897 transactions totaling [$]419,199 that were recorded in QuickBooks" but with no information "other than the dollar amount." Carradine said that between 2010 and 2012, there were at least 283 cash withdrawals totaling $1,640,367 from Texas RHH accounts.

Carradine said that she had never seen QuickBooks in worse shape; however, she was able to make some adjustments to a reasonable certainty, including recording the penalties and interest on the payroll taxes; moving the payroll taxes out of the line item "Net Debt and Notes Payable" and into "Current Liabilities"; and recording distributions to Brady that had been improperly recorded. Carradine said that the IRS penalties that had been assessed on the unpaid payroll taxes were not entered anywhere in the QuickBooks files, in Furtek's work papers, or in any of the financial statements that had been provided to Maxus but, as a basic accounting principle, they should have been booked as a current liability.

### b. Valuation

Maxus hired Hill to value Texas RHH as a going concern at the time of the APA's execution—December 31, 2012—using the financial information that was furnished to Maxus, Carradine's work, and the APA. He described the three approaches to performing valuation—income,[83] market,[84] and asset[85]—and he opined

---

[82]Carradine testified that Maxus had paid her and her staff $271,192.50 but that after over 1,150 hours, she was still unable to give an opinion as to what the true, complete, and accurate financial information of Texas RHH was in late 2012.

[83]Hill explained that in the income approach, one analyzes the company's historical and financial information and then performs a discounted cash flow by projecting the company's income out into the future and then reducing it to present value. Hill took the three years' worth of income statements that Maxus had been given and adjusted them based on Carradine's work to build a projection five years into the future from December 31, 2012, which he then brought "back to present value . . . at a rate that we felt was reasonable" for the assets and the "going concern"

75

that the "fair market value"[86] of Texas RHH's assets as of December 31, 2012, had been $5.34 million, resulting in Maxus's suffering $3.46 million in economic damages. Hill's secondary opinion was that under an "alternative purchase price discount valuation," Maxus had suffered approximately $2.2 million in economic damages.

---

goodwill value of the business. After projecting the revenue, he projected the cost of producing that revenue to get a measure of cash flow (EBITDA) and brought that back to present value. Hill then walked the jury through identifying the appropriate discount rate, which he calculated for Texas RHH with reference to the companies that he also used in the market approach and the issues uncovered with Texas RHH's financials, books, and records. He stated that he also looked at the weighted average cost of capital with a debt structure based on the public markets. The final number that he used for the discount rate was 26.5%.

[84]Hill explained that in the market approach, one uses companies in a similar line of business for guidance in determining market price. He analyzed five or six publicly traded companies, computing price by EBITDA ratios and multiples and discounting the public market for what those companies were selling for, and then used Pratt's Stats on mergers and acquisitions for companies in the home healthcare business. Because the market approach tries to use market data from at or around the same time period, there is nothing to discount because there is no projection into the future. He did, however, apply a discount to the published market numbers because publicly traded companies are audited and have analyst reports while small, closely held businesses do not. Hill said, "We're saying that [Texas RHH], with the facts and circumstances, is worth no more than 50% of the public companies, as far as price to EBITDA multiple."

[85]Hill said that under the asset approach, only the specific asset is valued, and he opined that it did not work under these circumstances "because the major assets of the company are the ones that generate the revenue and income, not the desks, chairs, minor equipment, cars, vans, etc."

[86]Hill defined "fair market value" as the price paid by a willing buyer to a willing seller with both being reasonably informed of all of the facts and neither being under compulsion at the time of the sale.

Hill valued Texas RHH's income-producing ability and took into account its management, financial condition, and tax liens but not its future financials, which he said were irrelevant in valuing a business as of a particular moment in time. He opined during cross-examination that the tax liability, which Maxus was not buying, reflected mismanagement, which he counted towards the discount "because of the unknown riskiness of the company," but he conceded that Maxus did not buy the company's then-existing management. Hill determined that the company was distressed, not the assets. And he stated that he had valued the company based on the tax liability's being created over a number of years, raising the riskiness of how the company was financed, and that he would have valued Texas RHH at $5.5 million, regardless of whether Brady had disclosed the tax liability to Maxus.

Hill testified that when a business is more than merely an asset-holding company, the goodwill-and-going-concern value is the business's value from a cash-flow viewpoint and that under the APA's schedule, 97% of the total $8.8 million purchase price was for goodwill.

During cross-examination, Hill acknowledged that his adjusted EBITDA for Texas RHH as of November 30, 2012 was over $2 million, which multiplied by 5 would be "[$]10 million and change." But he stated that $10 million was not the appropriate value of Texas RHH's assets because of the risks associated with the business's management at the time of the sale. Hill said that it did not matter that Brady had paid off the tax liability on the day of closing, as the company's

mismanagement by using tax money to fund its growth "wouldn't have changed just because that debt [was] suddenly paid off."

Scott Dalrymple, Texas RHH's damages expert,[87] testified that value was a "forward-looking concept," that the risk associated with the company and the risk associated with the assets were "two different things," and that Hill's analyses were flawed because he had projected to the assets the risk that existed within Texas RHH, rendering his valuation analysis "fundamentally unreliable" because all of the risks—tax liability, financial mismanagement, poor recordkeeping—were eliminated upon the sale of the assets. Dalrymple stated,

> The value of something is expected future benefits, and to measure future benefits, you have to evaluate what you expect, and you have to evaluate the riskiness with which you expect to be associated with those future benefits, so, for instance, cash flows. The riskier . . . the asset, the less the asset is going to be worth. And so . . . by taking risk that existed at Texas RHH and applying that to the expected future cash flows derived from the assets, you will understate the value, any valuation exercise that you perform, and you, therefore, cannot compare that valuation to the purchase price of the assets.

Dalrymple said that just as value is derived from expected future benefits, the risks associated with those expected benefits also had to be forward-looking; thus, he concluded that Hill had inappropriately looked back at risk that existed prior to the sale—even though such risk was not transferred with the assets—to draw conclusions about the future benefits to be generated from those assets. He said that Hill could

---

[87]Dalrymple testified that he was a chartered financial analyst with a master's in economics from the London School of Economics.

not explain how the risks affected the cash flow when the liabilities were not transferred with the assets. And he said that Hill's analyses and conclusions were not consistent with how one would normally compute damages because Hill had failed to link a change in economic position (harm) to an allegation in the case and that it was not enough to simply perform a valuation analysis, compare it to the purchase price, and claim that the difference is damages when there was no evidence that Brady would have taken less than $8.8 million.

Dalrymple also said that he had found errors in Hill's application of income- and market-approach methods and in the mechanics of Hill's application to the forecast of revenue going forward based on industry trend instead of actual performance. Dalrymple stated that by increasing the discount rate, Hill had reduced the assets' value but that his rationale for doing so could not be projected onto the future benefits that would have accrued to Maxus.

With regard to Hill's market approach, Dalrymple complained that Hill's 40%-to-50% discount amounted to an "arbitrary reduction in value" based on Carradine's findings, which Dalrymple said could not be applied to the assets' valuation. Dalrymple said that Hill's opinion that the damages were between $2.2 million and $3.46 million was unsupported because the studies he had used to determine the lower range of damages were not relevant when those companies had not faced similar situations.

During cross-examination, Dalrymple agreed that Hill did not need to put a value on the office furniture or other hard assets and that it was acceptable to value assets on a going-forward basis (operational value). He also agreed that the income approach was an accepted method to arrive at operational value (i.e., future cash flows to be generated through operations). Dalrymple stated that "the income approach is looking at expected future cash flows and discounting those cash flows to account for the risk associated with earning those cash flows," i.e., the net cash flows that would be realized from operating the business (revenues less expenses and capital expenditures and the business's working capital requirements). Dalrymple explained that where Hill had erred was by taking the risk associated with Texas RHH's operations and using that to discount the future cash flows. Dalrymple said that he did not know if the IRS had a lien or a levy; he understood that the IRS had some claim on the assets but did not know the details or the amount involved but that the value of the assets was independent of the claims on those assets.

Dalrymple testified that the undisclosed $3 million in unpaid taxes, interest, and penalties was not economically relevant and that Hill's opinion that Texas RHH was "distressed" implied a lack of alternatives and did not take into account that Texas RHH could have paid down the liability and continued to operate the business, could have borrowed money to pay off the liability, could have found a different buyer, or could have worked out an IRS installment plan.

80

Dalrymple did not make any independent EBITDA calculations. He agreed that the income and market approaches were acceptable for valuation purposes. He also agreed that he would not rely on inaccurate financial statements to perform a valuation "without understanding what those inaccuracies were and if they're material."

Hammond testified that he thought the assets that Maxus had purchased from Texas RHH were worth "roughly $4 million" because of Texas RHH's financial condition. He added, "We've gotten maybe two-thirds of what was promised, and we've gotten nothing but grief from Ms. Brady. She's interfered with our business multiple times, and that's just a ballpark estimate of what I think it was worth, given the circumstances that we know today." Hammond said that Brady had sold the assets to Maxus at a dramatically inflated price and that it would be impossible to return them to Brady for a refund because Maxus had changed personnel and systems and had enhanced the assets' value, so "it's not the same business it was when she sold it to us."

## L. Jury Findings

The parties entered a Rule 11 agreement whereby they agreed that they would try the entire case to the jury, which would answer questions as to all of the parties' claims, but that the findings on Maxus's claims against Texas RHH and Texas RHH's counterclaims against Maxus would be advisory to the trial court's judgment on those

claims.[88]  At the trial's conclusion, the trial court submitted 69 questions to the jury, which returned a 10–2 verdict.

As to Maxus's breach-of-contract claims against Texas RHH, the jury found that Texas RHH had failed to comply with APA Sections 1.1(a)(ix) (acquired intellectual property), 1.1(a)(xiii) (other necessary assets), 2.16 (financial information), 2.17 (taxes), and 4.15 ("Granbury Provider"); that such failures were not excused; and that Texas RHH had failed to comply with the APA by not transferring Zera's ZirMed and Kinnser accounts to Maxus.  The jury also found that Texas RHH and Brady had committed fraud against Maxus, that Brady had committed harmful access of Maxus's computer, and that Zera had breached its management agreement with Maxus.

As to Section 1.1(a)(ix)'s damages, the jury found that $31,000 would compensate Maxus for how much it had expended "in having to create a new QuickBooks accounting and payroll system."  The jury also found this $31,000 amount on the same issue in one of Section 2.16's breaches; for the remaining Section 2.16 breaches, the jury awarded to Maxus $2.3 million as the difference between how much Maxus had paid to buy Texas RHH's assets on December 31, 2012, and their fair market value on December 31, 2012, and $100,000 as the amount that Maxus had paid to correct Texas RHH's financial statements.  The jury made the same $2.3

---

[88]The parties also entered a Rule 11 agreement to try attorney's fees to the bench.

82

million damages finding as to the Section 2.17 breach and as to the fraud finding; the jury assigned no responsibility to Texas RHH for the fraud damages but 80% to Brady and 20% to Furtek.

As to the breaches of Sections 1.1(a)(xiii) and 4.15, and as to Maxus's promissory-estoppel questions, the jury found that the Zera provider number's fair market value was $250,000. The jury found that the APA did not require Texas RHH to transfer the Zera provider number to Maxus but that Maxus had substantially relied to its detriment on Zera's promise that Maxus would receive it and that this reliance was foreseeable by Zera. For Zera's breach of the management agreement, the jury found that the IRS had levied $92,000 from Zera's bank account during the agreement's term and that the amount of money owed to Maxus for services rendered but unpaid under the management agreement was $23,112.83. For the harmful-access-of-computer claim, the jury found that Maxus had expended $9,628.89 in changing its email hosting service. The jury also found that 100% of the funds held in escrow should be paid to Maxus.[89]

**M. Post-Trial Events**

After Maxus moved for entry of final judgment and for its attorney's fees, BP Chaney sought attorney's fees and expenses against Maxus, arguing that it had

---

[89]The jury made findings for Maxus on a number of other causes of action, but because they are not at issue in this appeal, we will not go into them.

prevailed on Maxus's breach-of-lease claim.  We have consolidated the judgment's awards at issue in this appeal as follows:

| Cause of Action | Recovery for Maxus |
| --- | --- |
| Breach of APA 1.1(a)(ix) | $31,000 actual damages from Texas RHH |
| Breach of APA 2.16 and 2.17 | $2.3 million actual damages from Texas RHH less 100% of funds held in escrow |
| Breach of APA 2.16 as to Texas RHH's representation that its books and records were kept in accordance with sound accounting principles | $131,000 actual damages from Texas RHH |
| Breach of APA 4.15 | $250,000 actual damages from Texas RHH |
| Breach of management agreement | $115,112.83 actual damages from Zera |
| Broken promise that the Zera Medicare provider number would be transferred to Maxus | $250,000 actual damages from Zera |
| Fraud against Maxus | $2.3 million actual damages from Brady, less $250,000 from settling defendant |
| Harmful access of Maxus's computer | $9,628.89 actual damages from Brady |
| Texas RHH's APA breaches | $1,237,655.87 in attorney's fees from Texas RHH and conditional appellate attorney's fees |
| Breach of management agreement | $53,006.90 in attorney's fees from Zera and conditional appellate attorney's fees |
| Harmful access of Maxus's computer | $15,901.83 in attorney's fees from Brady and conditional appellate attorney's fees |
| BP Chaney's claim for breach of the commercial lease | $15,901.83 in attorney's fees from BP Chaney and conditional appellate attorney's fees |

The judgment awarded specific performance for Maxus with regard to Zera's Kinnser and ZirMed contracts.  It also awarded to Maxus $818,525.76 "in expert witness fees,

84

costs for copies of depositions, costs of court and other expenses (e.g.[,] copy, travel, electronic storage, etc.)." This appeal followed.

## III. Legal Sufficiency of the Evidence

In their first four issues, Appellants challenge the legal sufficiency of the evidence to support the jury's findings on breach of contract by Texas RHH, fraud and harmful access of a computer system by Brady, and breach of contract and promissory estoppel as to Zera.

## A. Standard of Review

We may sustain a legal sufficiency challenge—that is, a no-evidence challenge—only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Holt Atherton*

85

*Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *see Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

## B. Breach of Contract by Texas RHH

Appellants raise multiple arguments in parts of their first and second issues regarding the judgment against Texas RHH for breach of contract.

### 1. Applicable Law

Generally, a plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract,[90] (2) the plaintiff performed or tendered performance as the contract required, (3) the defendant breached the contract by failing to perform or tender performance as the contract required, and (4) the plaintiff sustained damages as a result of the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). Contested fact issues are for the jury to resolve, and the burden of proof is on the party seeking a remedy. *Id.*

Our primary objective in construing a contract is to give effect to the written expression of the parties' intent. *Id.* at 888. A contract's plain language controls, "not

---

[90]To prove the existence of a valid contract, the plaintiff must establish, among other things, that the parties had a meeting of the minds on the contract's essential terms. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (op. on reh'g). The jury need only be asked and instructed about the issues that the parties dispute and on which the pleadings and evidence raise an issue. *Id.* at 501. Although the parties presented different versions of what each believed the APA contained, the jury was not charged on whether there was a meeting of the minds on the APA's terms, no one has raised this issue, and the jury was free to believe or disbelieve any of the witnesses. *See City of Keller*, 168 S.W.3d at 819 ("Jurors . . . may choose to believe one witness and disbelieve another.").

what one side or the other alleges they intended to say but did not." *Id.* Thus, we interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise. *Id.* And we must consider the entire writing in an effort to harmonize and give effect to all of the contract's provisions so that none will be rendered meaningless. *Id.* at 889. Further, courts may not rely on evidence of surrounding circumstances to make the contract's language say what it unambiguously does not say or to create an ambiguity. *Id.* We may consider objectively determinable facts and circumstances that contextualize the parties' transaction and inform the meaning of the language used, but we may not use surrounding circumstances to alter or contradict an unambiguous contract's terms. *Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 109 (Tex. 2018).

To recover damages for breach of contract, a plaintiff must show that as a result of the breach, he suffered a pecuniary loss that is the natural, probable, and foreseeable consequence of the defendant's conduct. *AZZ, Inc. v. Morgan*, 462 S.W.3d 284, 289 (Tex. App.—Fort Worth 2015, no pet.). A plaintiff may not recover breach-of-contract damages if those damages "are remote, contingent, speculative, or conjectural." *Id.* That is, the absence of a causal connection between the alleged breach and the damages will preclude recovery. *Id.*

### 2. APA Provisions

87

Appellants challenge the legal sufficiency of the evidence to support the trial court's judgment that Texas RHH breached APA Sections 1.1(a)(ix), 2.16, 2.17, and 4.15.

### a. Sections 2.16 and 2.17

#### (1) The parties' arguments

Appellants argue that Texas RHH's payroll tax liability could not, as a matter of law, support the judgment against Texas RHH for breaching Sections 2.16 and 2.17 because it is undisputed that the liability was paid, that the IRS lien was released prior to closing, and that the IRS tax liability was disclosed in some of Texas RHH's financial documents prior to closing. They argue that there is no evidence that Maxus suffered damages as a consequence of the extinguished tax liability or as a natural, probable, or foreseeable consequence of the IRS tax lien because Maxus was not damaged by liabilities that it did not acquire. Appellants also argue that the trial court erred by entering judgment for Maxus on its breach-of-contract claim based on its argument that it would have offered less for the assets if it had discovered the unpaid tax liability before closing.

Maxus responds that the representations contained in Section 2.16 were false because there was overwhelming evidence at trial that Texas RHH's financials were not true, complete, and accurate and that Texas RHH's books and records had not been maintained in accordance with sound accounting principles. Maxus further responds that even if the tax liability had been disclosed, that disclosure had no

bearing on whether the representations in Section 2.16 were true. Maxus states that even if Angie had seen the $1.9 million tax liability in the 2011 cost report, "she would have assumed that the liability had been paid in light of the fact that it was not identified as a 'Current Liability' on the subsequently-updated financial statements [that] Brady provided," that the 940s and 941s showed only the balance due and not whether Texas RHH had failed to pay the payroll taxes, and that the remittance advices did not identify the multimillion-dollar tax liability but instead showed only an "LE" code.

Maxus states that the representations in Section 2.17 were false because they were measured as "true and accurate in all material respects on and as of the Closing Date," which the APA defined as December 31, 2012, and until Brady paid the federal tax lien that afternoon, Texas RHH had overdue and unpaid taxes (which the APA defined to include penalties and interest) related to the acquired assets.

### (2) Analysis as to breach

The APA defined "Taxes" to include, among other things, any federal or state tax, penalties, and interest "whether disputed or not." While some of the unpaid federal payroll taxes were undeniably disclosed during due diligence,[91] the record

---

[91]For example, line 36 of the third-to-last page of 113 pages of cost reports that Mertz forwarded to Angie contained a listing for "payroll taxes payable" of $1,891,303. We note that in light of Brady's testimony that she had never talked with anyone on the Maxus team about her unpaid payroll taxes, the jury could have found that, much like bodies and toxic waste, she had hidden these bad facts by burying them.

89

reflects that no one representing Texas RHH during the transaction—Brady, Furtek, Hammer, or Mertz—mentioned the unpaid taxes to Maxus, disclosed the interest and penalties on those unpaid taxes to Maxus in any of the "financial information" under Section 2.16, or disclosed to Maxus that a federal tax lien and a state tax lien had also been placed on Texas RHH's assets. While Maxus would not have assumed these liabilities under the APA's terms, the lack of disclosure called into question all of Texas RHH and Brady's other representations upon which Maxus had valued the business's assets.

Further, although the federal tax liability was paid immediately prior to closing, APA Article II, which contained Sections 2.16 and 2.17, expressly provides that the statements therein are true and accurate in all material respects "on and as of the Closing Date," without reference to a specific time. Brady admitted that the federal tax lien existed on the morning of December 31, 2012, and Maxus's evidence showed that there had been a state tax lien that was owed but not disclosed prior to the APA's execution and not released until 2014.

Maxus's evidence also showed that the cost reports did not include the penalties and interest that had accrued and were also due and that the penalties and interest were not included in the balance sheets that Brady and Texas RHH had provided to Maxus, making the financial information (as defined in the APA) not "true, complete[,] and accurate" and failing to accurately represent the results of Texas RHH's operations. Brady acknowledged that her QuickBooks were a "mess," and

Carradine testified that Brady's books and records were not maintained in accordance with sound accounting principles and did not properly reflect all of Texas RHH's transactions. There was ample evidence, as set out above, upon which the jury could have found that Texas RHH had breached both Sections 2.16 and 2.17. Accordingly, we overrule this portion of Appellants' first and second issues.

### (3) Analysis of the $2.3 million in damages

Appellants complain that Maxus's expert Hill (1) did not value the assets that Maxus had acquired, (2) did not consider that the APA had relieved Maxus of responsibility for pre-existing taxes, and (3) did not consider that the payroll taxes had been paid and that the lien had been released prior to Maxus's taking title to the assets, such that his testimony constitutes no evidence that Texas RHH's extinguished tax liability caused any damage to Maxus.[92] Maxus responds that Hill valued the Texas RHH business, not just the assets, because under the APA, Maxus had acquired "[a]ll the goodwill and going concern value of the business."

---

[92]In a footnote, Appellants also state that the damages questions on the value of Texas RHH's assets as of December 31, 2012, were immaterial and should have resulted in a judgment notwithstanding the verdict for them or were defective, entitling them to a new trial. They cite us to *Spencer v. Eagle Star Insurance Co. of America*, 876 S.W.2d 154, 157 (Tex. 1994) (op. on reh'g), to support this argument. But *Spencer*, an insurance case, merely states the general rules for when a trial court may disregard a jury finding. *See id.* Appellants provide no explanation to support their complaint that the damages questions here were either immaterial or defective. *Cf.* Tex. R. App. P. 38.1(i). Accordingly, we overrule this portion of their first issue as inadequately briefed. *See id.*

91

Schedule 1.2(c) of the APA, labeled "Purchase Price Allocation," lists $8,458,977 (96% of the total $8.8 million purchase price) as the value of the goodwill associated with the assets; the remaining assets—supplies, vehicles, furniture, fixtures, and equipment—were listed at $241,023, and Maxus paid $100,000 for Brady's noncompete covenant.

Business goodwill is an intangible asset based on reputation and the relationships that a company has developed with its customers and employees. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 777 (Tex. 2011) (op. on reh'g) ("Texas law has long recognized that goodwill, although intangible, is property and is an integral part of the business just as its physical assets are."); *Ingram v. Deere*, 288 S.W.3d 886, 902 (Tex. 2009) ("Reputation is a type of goodwill and may be valuable intangible property."); *Phuong Nguyen v. ABLe Commc'ns, Inc.*, No. 02-19-00069-CV, 2020 WL 2071757, at *18 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) (explaining that "goodwill" is generally understood to mean the advantages that accrue to a business on account of its name, location, reputation, and success and that are used to attract and retain customers).  It is also viewed as the ability to earn income in excess of that which would be expected from the business if viewed as a mere collection of assets. *Heritage Operating, L.P. v. Rhine Bros., LLC*, No. 02-10-00474-CV, 2012 WL 2344864, at *4 (Tex. App.—Fort Worth June 21, 2012, no pet.) (mem. op. on reh'g) (quoting Black's Law Dictionary 763 (9th ed. 2009)).

Hill testified that the goodwill-and-going-concern value of a business is its value from a cash-flow point of view, and the record reflects that Texas RHH had experienced cash-flow issues, both from growth and from Brady's taking money out of the company to fund personal expenses, resulting in a multimillion-dollar liability for unpaid payroll taxes and the interest and penalties thereon. Thus, the jury could have found that the goodwill value set out in the APA was too high from a cash-flow point of view at the time of the sale. *See Spencer*, 876 S.W.2d at 158 (citing *W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127 (Tex. 1988)).[93]

Further, contrary to Appellants' assertions that Hill did not consider that the APA relieved Maxus of any responsibility for pre-existing taxes and did not consider that the payroll taxes had been paid and that the lien had been released prior to Maxus's taking title to the assets, Hill testified that it did not matter that Brady had paid off the tax liability on closing day, as the company's mismanagement by using IRS tax money to fund its growth "wouldn't have changed just because that debt [was] suddenly paid off." Essentially, the jury was asked to determine by how much

---

[93]In *Spencer*, the court noted that the plaintiff in *Walters*, who had purchased a truck that was represented to be a year newer than it actually was, had failed to submit a proper measure of damages, which was either the loss of the benefit of the bargain—the truck as represented and as received—or his out-of-pocket losses. 876 S.W.2d at 158; *see Transcont'l Realty Invs., Inc. v. John T. Lupton Tr.*, 286 S.W.3d 635, 646 (Tex. App.—Dallas 2009, no pet.) (explaining that the out-of-pocket measure consists of the difference between the value parted with and the value received, while the benefit-of-the-bargain measure consists of the difference between the value of the bargain as represented and the value received).

Maxus had overpaid for the assets on the day of the sale and whether Maxus was entitled to recover the difference when the overvaluation was revealed. *See Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2020) ("Expectancy damages award a contract plaintiff the benefit of its bargain.").

The jury could have found that the assets' goodwill at the time of the sale had been overvalued because it was based on Brady's flawed financial representations and mismanagement. Texas RHH's assets had been represented by Brady as worth $8.8 million at the time of the sale, and Hill testified that the actual value of the business as a going concern (i.e., its goodwill) on the date of sale was $5.34 million, for a difference of $3.46 million. Although Dalrymple argued that Hill had speculated that Maxus would have gotten a better price on the assets, the jury knew—even if Dalrymple did not—that Brady could have been personally liable for $3 million to the IRS in unpaid payroll taxes, penalties, and interest by December 31, 2012, if the sale did not go through and that the sale was how she had planned to pay the IRS debt. That is, the jury could have found that Texas RHH was a distressed company, could have disbelieved Brady's insistence that she did not need to sell it, and could have inferred that she would have accepted less if Maxus had known the truth about Renew Home Health's financials.

Based on the jury's findings under Sections 2.16 and 2.17, the trial court awarded Maxus $2.3 million as damages for the breach of these sections. Based on the evidence presented at trial, the jury could have found that the difference in Texas

RHH's assets' value (including goodwill) at the time of sale was anywhere from zero (i.e., that the assets were worth the full $8.8 million) to $3.46 million; accordingly, the evidence is sufficient to support the $2.3 million in the jury's finding and in the judgment, and we overrule this portion of Appellants' first and second issues.

### (4) Analysis of $131,000 in damages under Section 2.16

The jury also found that Texas RHH's failure to comply with Section 2.16 cost Maxus $31,000 in "having to create a new QuickBooks accounting and payroll system" and $100,000 "to correct Texas RHH's financial statements" as a natural, probable, and foreseeable consequence of its failure to comply.

Appellants argue that any duty to provide QuickBooks was not governed by Section 2.16, so the $31,000 in damages awarded under Section 2.16 is not supported by the verdict, and that the additional $100,000 in damages under Section 2.16 for recreating Texas RHH's financials was not a natural, probable, or foreseeable consequence or was not reasonably related to the financial information covered by that section.[94]

---

[94] Appellants state that it was not natural, probable, or foreseeable that Maxus would "recreate" Texas RHH's financials after closing or that Maxus would hire an expert years later to look for proof of fraud by reanalyzing Texas RHH's financials. Appellants argue that Maxus was not damaged because (1) it did not present any evidence that it needed to correct Texas RHH's financial statements for any reason other than paying its expert witness and (2) it has no one to blame but itself: "Maxus consciously chose not to hire accountants or lawyers to assist it with due diligence, despite knowing that Texas RHH's books and records had not been historically maintained in the manner one would expect of a publicly-traded or larger private company." Appellants argue that given the context under which the Section 2.16

Section 2.16 defines the following as "Financial Information": (1) Texas RHH's unaudited income statements for the years ending December 31, 2010, and December 31, 2011; (2) Texas RHH's unaudited balance sheets for the eleven-month period from January 1, 2012 through November 30, 2012; and (3) final federal income tax returns for 2006, 2007, 2008, 2009, 2010, and 2011. The remainder of Section 2.16 contains representations that the "Financial Information" is "true, complete and accurate and presents fairly the results of the operations of Seller for the periods covered thereby" and that the seller's books and records "have been maintained in accordance with sound accounting principles, in effect from time to time, as consistently applied by Seller and properly reflect all the transactions of Seller."

Section 2.16's plain language says nothing about QuickBooks, per se, and although it does reference "the seller's books and records," it does not define "Financial Information" to include them. We sustain this portion of Appellants' first issue and correct the judgment to delete the $31,000 awarded under Section 2.16.

And while Maxus proved that at least some of the "Financial Information" listed in Section 2.16 was not true, complete, and accurate, there is no evidence that Maxus recreated Texas RHH's federal income tax returns. Carradine testified that she "could not come up with corrected income statement[s] to a degree of reasonable

representations were made, it was not natural, probable, or foreseeable that after executing the APA, Maxus would hire experts to review the same documents and identify any discrepancies that it had missed during due diligence.

96

certainty" and that "there were numerous things that needed to be corrected, but there simply were no records that would allow [her] to correct those without guessing, so [she] was not able to correct them, even though [she] knew [that] errors existed." That leaves only the "unaudited balance sheets for the eleven-month period from January 1, 2012 through November 30, 2012" as the "Financial Information" that Maxus could have corrected under Section 2.16.

Carradine testified that she was able to trace some of the financial data that made up net income in the balance sheets, including a correction that increased Texas RHH's net income in 2012 by $269,000. Hill used Carradine's work to perform his valuation and to show that the assets were overvalued at the time of the sale.

But although Carradine testified that she and her staff spent "a little over 1,150 hours" on forensic accounting, which she described as preparing balance sheets and profit-and-loss statements, testified about their hourly rates ($375, $220, and $195, respectively), and testified that the total amount that she billed Maxus for the work was $271,192.50, the billing records that were admitted into evidence do not reflect how many hours each spent on correcting balance sheets versus profit-and-loss statements or other forensic accounting tasks. That is, the thirteen pages of billing statements do not indicate which tasks labeled as "review and analyze documents" and other similar descriptions pertained to correcting Texas RHH's balance sheets. Accordingly, we sustain the portion of Appellants' first issue pertaining to the $100,000 awarded in damages under Section 2.16 and remand this portion of

97

Appellants' first issue for the trial court's reconsideration. *Cf. Kinsel v. Lindsey*, 526 S.W.3d 411, 428 (Tex. 2017).

### b. Section 1.1(a)(ix)

APA Section 1.1(a)(ix), labeled "Acquired Intellectual Property," covered, among other things, the "computer software used by Seller relating to the [business of furnishing home health services by and through licensed and certified parent and branch agencies]." Maxus was awarded $31,000 for Texas RHH's breach of APA Section 1.1(a)(ix) with regard to the amount of money Maxus had to expend to create a new QuickBooks accounting and payroll system.

The record reflects that Brady had used QuickBooks for Texas RHH's accounting, including paying bills and processing payroll, since the company's inception. While Anderson denied that Maxus had planned to use Texas RHH's QuickBooks software, the jury could have chosen to disbelieve his testimony and instead to believe Angie's testimony that Maxus had planned to use the Texas RHH QuickBooks software to "plug and play" instead of recreating the accounting and payroll system and vendor information from scratch. Brady never gave Maxus the Texas RHH QuickBooks software and did not give Maxus the Texas RHH QuickBooks database file until discovery began in the lawsuit.

Angie said that because Brady did not give them the QuickBooks, Maxus had to buy a new QuickBooks system and start from scratch, costing $32,000 of her time and $31,000 of a consultant's time in getting Maxus's new QuickBooks system up and

running. Because the evidence is sufficient to support the jury's finding with regard to breach of APA section 1.1(a)(ix) and the $31,000 award, we overrule this portion of Appellants' first and second issues.[95]

### c. Section 4.15

Appellants complain that the trial court erred by finding that Texas RHH breached section 4.15 and awarding Maxus $250,000 for Zera's Medicare provider number despite the jury's finding that the APA did not *require* Texas RHH to transfer it to Maxus.

Maxus responds that Section 4.15 required Texas RHH to maintain the management agreement between Maxus and Zera *until* Maxus acquired Zera's Medicare provider number, that Texas RHH failed to honor this agreement when Zera terminated the management agreement before a purchase agreement for Zera's Medicare provider number was executed, and that the breach cost Maxus the benefit of Zera's provider number.

Section 4.15 required Maxus to execute a management agreement with Zera and stated that the management agreement "shall be in place until a purchase agreement for the Granbury Provider is executed between *the Parties* after the required third anniversary of the Medicare Provider enrollment of January 19, 2011."

---

[95]Because we sustained the portion of Appellants' first issue with regard to the $31,000 awarded for breach under Section 2.16 and corrected that part of the judgment, we do not reach the portion of Appellants' fifth issue regarding double recovery of the same amount under Section 1.1(a)(ix). *See* Tex. R. App. P. 47.1.

99

[Emphasis added.] The APA defines "Parties" as "Buyer" (Maxus) and "Seller" (Texas RHH). It is undisputed that Texas RHH did not own the Zera provider number; therefore, it could not execute a purchase agreement for the sale of Zera to Maxus. Pursuant to the APA's severability clause,[96] the remaining portion of Section 4.15 merely required Maxus to execute a management agreement with Zera, which Maxus did. Because the record reflects that Texas RHH did not breach Section 4.15, we sustain this portion of Appellants' first and second issues and correct the judgment to delete the $250,000 awarded as damages for Section 4.15.[97]

### 3. Specific Performance

Appellants argue that the trial court erred by ordering Texas RHH to transfer Zera's Kinnser and ZirMed contracts, complaining that "[e]ven if Texas RHH [were]

---

[96]APA section 7.9, labeled "Severability," states that if any provision or part of any provision

> contained in [the APA] will for any reason be held to be invalid, illegal[,] or unenforceable in any respect, such invalidity, illegality[,] or unenforceability will not affect any other provision (or remaining part of the affected provision) of [the APA], and [the APA] will be construed as if such invalid, illegal[,] or unenforceable provision (or part thereof) had never been contained herein, but only to the extent such provision (or part thereof) is invalid, illegal[,] or unenforceable.

[97]Based on our resolution of this portion of Appellants' first and second issues, we do not reach the portion of their fifth issue regarding double recovery of the $250,000 awarded to Maxus from Texas RHH for the value of Zera's Medicare provider number. *See* Tex. R. App. P. 47.1.

capable of transferring assets that don't belong to it, the APA did not obligate it to do so" with the clarity required for specific performance.

A contract is subject to specific performance if it contains the essential terms of a contract, expressed with such certainty and clarity that it may be understood without recourse to parol evidence. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App.—Fort Worth 2008, pet. denied). Specific performance is an equitable remedy that may be awarded at the trial court's discretion upon a showing of breach of contract. *Id.*

The following paragraphs of the APA are relevant to our determination. The "Acquired Assets" in Section 1.1(a) include "acquired patient and billing records," defined as "all records, files, patient records, and billing records for all active patients as of the Closing Date, whether in hard copy or on computer tapes or disks of Seller." The "Acquired Assets" also include "[a]ll the intangible assets of Seller relating to the Business." The "Acquired Assets" include "Assigned General Contracts," defined by the APA as "all right, title[,] and interest of Seller in and to the Contracts generally relating to the Business and listed on Schedule 1.1(a)(viii)." The APA broadly defines "Contracts" as, "with respect to any person, all written or oral contracts, agreements, policies, plans, compensation arrangements, leases, licenses, obligations[,] and other arrangements to which such person is a party and by which its assets or properties are bound."

The "Acquired Assets" also include "Acquired Intellectual Property," defined in the APA as "[a]ll license agreements . . . and websites and computer software used by Seller relating to the Business." And the "Acquired Assets" include "Other Necessary Assets," defined by the APA as "[a]ny other privileges, rights, interests, *Contracts*, properties[,] and/or assets *of Seller* (other than the Excluded Assets) *relating to the Business which are necessary to continue conducting operations of the Business* following the Closing Date *in substantially the same manner as Seller historically conducted its operations prior to the Closing Date.*" [Emphasis added.]

Section 1.1(c), labeled "Effect of Prohibited Assignment," as it pertains to the accounts at issue, states,

> The Parties [defined in the APA as Maxus and Texas RHH] hereby acknowledge that certain of the . . . Assigned General Contracts *may not be transferable or assignable by Seller as a matter of right*, but instead require the Consent of a . . . lessee, licensor, customer *or other third-party*, as the case may be, and agree that *nothing in [the APA] may be construed as an attempt or agreement to transfer or assign (i) any Contract . . . which cannot be transferred or assigned without Consent, unless such Consent has been given, or (ii) any Contract or claim as to which all the rights and remedies for enforcement would not fully pass to Buyer incident to the transfers or assignments required by [the APA].* However, in order for Buyer to realize the full value of the items described in the preceding clauses (i) and (ii), Seller will, at the request of and under the direction of Buyer, use its best efforts, as permitted by applicable Legal Requirements, for (x) the rights and obligations of Seller thereunder to be preserved, and (y) to facilitate the collection of any monies due and payable thereunder after the Closing Date, which Seller will hold in trust for the benefit of and pay and deliver promptly to Buyer. *Without limiting the foregoing, Buyer and Seller will use best efforts to obtain such necessary Consents within a reasonable time period following the Closing Date.* Notwithstanding anything to the contrary herein, *Seller makes no guarantees that any necessary Consents will be obtained nor guarantees the timeframes in which such Consents, if any, may be obtained.* [Emphasis added.]

The APA defines "Consent" and "Consents" to mean "any authorizations, consents or approvals of third[]parties . . ., in each case, that are necessary or advisable in order for Seller to transfer the Acquired Assets to Buyer, for Buyer to pay the Purchase Price to Seller, and to otherwise consummate the transactions contemplated by this Agreement." APA Section 4.11, labeled "Required Consents," provides, "Each of the Parties covenants and agrees to use its best efforts to give all notices to, and obtain all Consents from, all Governmental Authorities and other persons that are necessary for the consummation of the transactions contemplated by [the APA]."

APA Section 7.6, labeled "Further Assurances," states that each party "agrees to furnish such information, to do all acts and things, and to execute and deliver such agreements, documents, certificates[,] and instruments as will from time to time be reasonably required to effectuate the terms and conditions of [the APA]." And APA Section 7.14 contains a merger clause, stating, "[The APA] and the other Acquisition Documents, together with all schedules and exhibits hereto and thereto, contain the entire understanding and agreement among the Parties with respect to the subject matter hereof, and supersede all prior discussions, understandings, and agreements (whether oral or written) between them with respect thereto." The APA defines "Acquisition Documents" as "the Bill of Sale, the Assumption Agreement, the Employment Agreements, the Assumption of Leases, and the exhibits, schedules,

certificates[,] and lists related to each of the foregoing, as applicable to each of Buyer and Seller."

The record reflects that Texas RHH and Zera each had its own Kinnser software system for billing but that Texas RHH used a ZirMed subaccount under Zera's contract with that vendor. Zera's Kinnser software account was not listed in the APA's schedules, but Zera's ZirMed account was.

Based on the above, nothing in the APA supports the transfer of Zera's Kinnser software system to Maxus. Accordingly, we sustain this portion of Appellants' second issue and correct the trial court's judgment to delete the specific performance requirement as to Zera's Kinnser software system.

However, because Zera's ZirMed account *was* listed in the APA's schedules by Hammer—despite Brady's and Anderson's testimony about mistakes in the schedules—and because the contract's plain language provides a basis for its transfer, we hold that the trial court did not abuse its discretion by awarding specific performance to transfer this account and overrule this portion of Appellants' second issue.

## C.  Fraud by Brady

### 1.  The parties' arguments

In part of their first issue, Appellants argue that the trial court erred by entering judgment against Brady for fraud in her individual capacity when Maxus neither pleaded nor proved that Brady had acted primarily for her personal benefit, referring

104

us to Business Organizations Code Section 21.223. Appellants claim that under Section 21.223, as the LLC's owner, Brady cannot be liable for misrepresentations made on Texas RHH's behalf unless Maxus pleaded and proved that she had used Texas RHH to commit fraud for her direct personal benefit.

Appellants also contend that there is no evidence of misrepresentation or omission, no evidence of materiality or justifiable reliance, and no evidence that Maxus suffered damages. They argue that Maxus "is a sophisticated company that entered a multi[]million[-]dollar transaction after conducting several months of due diligence," that the payroll tax liability was included in numerous financial documents provided to Maxus, that Maxus knew Texas RHH had encountered cash flow issues but did not care because it was interested only in how Texas RHH's assets would perform under Maxus's cost structure, and that there were numerous "red flags" in the financials but that Maxus had nonetheless failed to exercise any diligence in investigating Texas RHH's tax liability.[98]

Maxus responds that there is legally sufficient evidence to support the jury's findings that Brady committed fraud and that Maxus did not have to pierce Texas RHH's veil to hold Brady personally liable. Maxus argues that Section 21.223 does not apply because (1) Maxus did not seek to hold Brady liable as an "alter ego" of

---

[98]Appellants also rely on some of the same arguments addressed above regarding damages. As we have already addressed those arguments, we overrule this portion of Appellants' first issue. *See* Tex. R. App. P. 47.1.

105

Texas RHH for using Texas RHH as a "sham to perpetrate a fraud" or for any "other similar theory" but instead sought to hold her liable for her own fraudulent conduct, so whether she derived a personal benefit is beside the point, and (2) Maxus is not seeking to hold Brady liable for Texas RHH's "contractual obligation" or for "any matter relating to or arising from the obligation" but instead for her own fraud, which is neither a contractual obligation nor a matter relating to the contract or arising therefrom. Maxus refers us to *Alexander v. Kent*, 480 S.W.3d 676 (Tex. App.—Fort Worth 2015, no pet.), to support its Section 21.223 argument, and it contends that the "red flags" referenced by Texas RHH and Brady are not the type of "red flags" that would render Maxus's reliance unjustifiable.

## 2. Business Organizations Code Section 21.223

Section 21.223, which applies to LLCs via Section 101.002(a), reflects legislative limits on recovery from an individual based on a company's obligations. *See* Tex. Bus. Orgs. Code Ann. §§ 21.223(a)(2), (b), 101.002(a); *Chan v. Sharpe*, No. 02-14-00286-CV, 2015 WL 5722833, at *4 (Tex. App.—Fort Worth Aug. 26, 2015, pet. denied) (mem. op.) ("To pierce the corporate veil, and thus disregard the corporate form, a plaintiff must show that the shareholder used the corporation to 'perpetrate an actual fraud . . . primarily for the direct personal benefit' of the shareholder." (quoting Tex. Bus. Orgs. Code Ann. § 21.223(b))); *see also Ritchie v. Rupe*, 443 S.W.3d 856, 869 (Tex. 2014) (stating that "[f]raudulent or illegal actions by a corporation's directors may result in disregard of the corporate form" (citing Tex. Bus. Orgs. Code Ann. § 21.223(b)));

106

*PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 175 (Tex. 2007) (noting that fraud is vital to piercing the corporate veil under Section 21.223).

Under Section 21.223, a company's owner cannot be held liable to the company or to the company's obligees with respect to "any contractual obligation of the [company] or any matter relating to or arising from the obligation on the basis that the [owner] is or was the alter ego of the [company] or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory" unless the obligee shows that the owner "caused the [company] to be used for the purpose of perpetrating and did perpetrate actual fraud on the obligee primarily for the direct personal benefit" of the owner. Tex. Bus. Orgs. Code Ann. § 21.223(a)(2), (b). If Section 21.223 applies, then it "preempts any other liability imposed for that obligation under common law or otherwise" unless the owner expressly agreed to be personally liable to the obligee for the obligation or "is otherwise liable to the obligee for the obligation under this code or other applicable statute." *Id.* §§ 21.224–.225; *Willis v. Donnelly*, 199 S.W.3d 262, 272–73 (Tex. 2006) (holding that ratification is a "similar theory" of derivative liability covered by Section 21.223).

A split has arisen in the courts of appeals regarding whether Section 21.223 preempts an individual's direct tort liability in addition to his or her vicarious liability under a piercing-the-veil or related theory. *See Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 664–72 (W.D. Tex. 2019). As the federal district court noted in *Bates*, "Texas has long had two methods for holding individual

corporate agents or officers personally liable when they are acting within the course and scope of their employment or role as corporate agents—piercing the corporate veil or direct individual liability" and "recent cases [involving Section 21.223] have muddled [the] distinction" between these two methods. *Id.* at 664, 667. The court concluded that Section 21.223's language applied only to claims holding an owner vicariously liable for a contract-related corporate obligation in both contract and tort and to claims seeking to hold an owner liable for a corporate obligation on the basis of other "classic veil piercing" scenarios under Texas common law. *Id.* at 672–73.

Appellants refer us to *TecLogistics, Inc. v. Dresser-Rand Group*, a cross-appeal of a judgment on a jury verdict on breach of contract and fraud in which our sister court considered Section 21.223's application. 527 S.W.3d 591, 599–600, 603 (Tex. App.—Houston [14th Dist.] 2017, no pet.). TecLogistics's president had created false invoices to bill Dresser Rand. *Id.* at 592–93, 596, 597–98. At trial, Dresser Rand submitted a proposed jury question regarding the president's individual liability for common law fraud, and the court considered whether the proposed question was raised by the pleadings and evidence. *Id.* at 595.

The court held, among other things, that the trial court did not abuse its discretion by refusing the proposed question, reasoning that Section 21.223 had entirely replaced the common law and that neither statutory exception applied. *Id.* at 591, 598–99. The court noted that because TecLogistics's president was the only person involved in creating and tendering the false invoices to Dresser Rand, she was

108

the human agent through which TecLogistics had committed actual fraud. *Id.* Thus, because the court concluded that Section 21.223(a)(2)'s requirements were met, TecLogistics's president was shielded when Dresser Rand (1) had failed to allege in its pleadings that she had acted primarily for her direct personal benefit, (2) had presented no such evidence of her acting for her direct personal benefit at trial, and (3) had proposed no jury question that would have permitted such a finding. *Id.* at 598–99, 603.

Maxus relies on *Alexander* to support its argument that Brady is directly and individually liable for fraud. In *Alexander*, we stated that the general rule in Texas "has always been" that a "corporation's employee is personally liable for tortious acts which he directs or participates in during his employment" and that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when made in the capacity of a corporate representative. 480 S.W.3d at 697–98.

In *Alexander*, Kent (the plaintiff and later appellee) hired K.B. Alexander Co. (KBA), a construction company of which Alexander was president and sole stockholder. *Id.* at 680. Kent sued KBA for breach of contract and Alexander individually for fraud based on false payment applications misrepresenting that subcontractors had been paid. *Id.* at 680, 682–83. Kent nonsuited KBA after it declared bankruptcy and proceeded on his fraud claim against Alexander. *Id.*

Although Alexander argued that he could not be held individually liable because he was not a party to the Kent–KBA contract and had signed the contract and pay applications only in his capacity as KBA's president, we concluded that because the action involved holding Alexander liable for his own fraudulent statements, there was no need to pierce the corporate veil under a vicarious liability theory. *See id.* at 697–98; *cf. Chan*, 2015 WL 5722833, at *5 (holding that when each of the appellant's claims sought to impose personal liability on his fellow shareholders for obligations owed by their company Wan Fu Foods, Inc., Section 21.223(b) imposed a burden on the appellant to prove actual fraud).

Maxus sued Brady for fraud based on her acts and omissions throughout the due diligence and negotiation process that led to Maxus's overpayment for Texas RHH's assets. Because Maxus's fraud claim is based on Brady's direct liability for fraudulent acts, we decline Appellants' invitation to follow our sister court's interpretation of Section 21.223. *See Alexander*, 480 S.W.3d at 697–98. We overrule this portion of Appellants' first issue.

### 3. Common law fraud

To prove a common law fraud claim, a plaintiff must establish (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made by the defendant with the intention that it should be acted upon by the plaintiff, (4) who relied on it, and (5) which reliance caused injury. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

110

A misrepresentation may consist of the concealment or nondisclosure of a material fact when there is a duty to disclose, and the duty to disclose arises when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth. *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied). A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question. *Id.*

A fraud claim requires a plaintiff to show actual and justifiable reliance. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Reliance is usually a fact question for which the factfinder must consider the plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged fraud. *Id.*; *see JP Morgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018). "Moreover, a person may not justifiably rely on a representation if there are 'red flags' indicating such reliance is unwarranted." *Grant Thornton LLP*, 314 S.W.3d at 923 (internal quotations omitted). When a party fails to exercise reasonable diligence, it is charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated. *JP Morgan Chase Bank, N.A.*, 546 S.W.3d at 654. One does not have to conduct an independent investigation or audit to justifiably rely on another party's false, material representation when the misrepresentations are not "outlandish, preposterous, or so patently and obviously false" that one would have to close his or

111

her eyes to avoid discovering their falseness. *Hannon, Inc. v. Scott*, No. 02-10-00012-CV, 2011 WL 1833106, at *8 (Tex. App.—Fort Worth May 12, 2011, pet. denied) (mem. op.) (noting that the factfinder was entitled to evaluate the plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the defendant's misrepresentations to determine whether there was actual reliance on those misrepresentations).

The record is replete with examples of Brady's misrepresentations and omissions with regard to the financial information that she provided to Maxus. From this, and from Brady's own testimony, the jury could determine that Brady had intended for Maxus to rely upon that information, which contrasted greatly with her statements to the IRS, in the parties' negotiations. Angie, Hammond, and Anderson testified that they had relied on the information that Brady had provided to them in calculating the purchase price, and multiple witnesses testified that the misrepresentations in that information were material. Because we have already addressed the damages caused by Brady's misrepresentations in our breach-of-contract analysis above with regard to Texas RHH,[99] the only remaining question is whether the Maxus team's reliance on Brady's misrepresentations and omissions was justifiable.

---

[99]Benefit-of-the-bargain fraud damages are calculated "at the time of sale," i.e., when they are incurred. *Durant v. Anderson*, No. 02-14-00283-CV, 2020 WL 1295058, at *13 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied) (mem. op.) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (op. on reh'g)).

The record reflects that the Maxus team opted to forego the expert assistance of an attorney or a CPA during the APA negotiations, and instead of running a lien search in the county records during due diligence, they opted to rely on the representations and warranties that they had included in the APA. At least one member of the Maxus team—Hammond—had three decades of business experience, but he was an acknowledged neophyte in the home healthcare world and left the due diligence to Angie and Anderson. Angie and Anderson each had some prior experience in negotiating home healthcare acquisitions, but they had both also been laid off from those positions, which is how they ended up working for Maxus. Nevertheless, the jury could have found that they had exercised reasonable diligence and were not willfully blind but had relied on Brady's representations because she gave the Maxus team all of the information it had requested after burying the very tax liabilities and problems that she had simultaneously highlighted in her dialogues with Furtek, her tax attorneys, and the IRS.

Based on the above, the jury had before it more than a scintilla of evidence that Maxus justifiably relied on Brady's misrepresentations and omissions. Accordingly, we overrule this portion of Appellants' first issue.

## D. Escrow Funds

In the final portion of their first issue, Appellants ask us to reverse the part of the trial court's judgment that orders the escrow company to release funds to Maxus, arguing that Maxus can be released from further obligation under the contract only if

113

Texas RHH materially breached the contract. Based on our resolution of the breach-of-contract questions above, we overrule the remainder of Appellants' first issue.

## E. Harmful Access of Computer System by Brady

In their fourth issue, Appellants complain that the trial court erred by entering judgment against Brady for harmful access of Maxus's computer system.

Under Civil Practice and Remedies Code Section 143.001, a person who is injured or whose property has been damaged as a result of a violation under Penal Code Chapter 33 has a civil cause of action if the conduct constituting the violation was committed knowingly and intentionally. Tex. Civ. Prac. & Rem. Code Ann. § 143.001(a). Penal Code Section 33.02, entitled "Breach of Computer Security," provides that a person commits an offense if she knowingly accesses a computer, computer network, or computer system without the owner's effective consent. Tex. Penal Code Ann. § 33.02(a).

The jury charge added "intentionally" to the Penal Code definition and defined "intentionally," "knowingly," "access," and "effective consent." It defined "access" as "to approach, instruct, communicate with, store data in, retrieve or intercept data from, alter data or computer software in, or otherwise make use of any resource of a computer, computer network, computer program, or computer system."

Appellants argue that (1) Maxus presented no evidence that Brady accessed any email, computer, computer network, or computer system owned by Maxus or caused it damages by doing so; (2) under the APA, Maxus acquired only Texas RHH's

114

internet domain name and website, not its historical business records; and (3) there is no evidence that Maxus incurred its costs of purchasing a new hosting system and new server as a result of Brady's actions when whether or not Maxus had continued to use Hostway or contracted with a new hosting service, it would still have had to pay for that service.

APA Section 1.1(a)(ix), "Acquired Intellectual Property," provides that Maxus acquired all internet domain names, websites, and computer software used by Texas RHH relating to the home healthcare business. APA Section 1.1(a)(xi) provides that Maxus acquired "all . . . computerized databases, . . . policy and procedure manuals, documents, records, tapes, files and papers of [Texas RHH] related to the Business, whether in electronic form or otherwise," and APA Section 1.1(a)(xiii)'s "Other Necessary Assets" is a catchall for any of Texas RHH's assets "relating to the Business which are necessary to continue conducting operations of the Business following the Closing Date in substantially the same manner as Seller historically conducted its operations prior to the Closing Date."

Under Section 1.1(d)(vi), Maxus was entitled to copies of business records that Texas RHH was required to retain pursuant to legal requirements; the only expressly excluded records, per Section 1.1(d)(viii), were records that pertained to Texas RHH's status as an LLC, i.e., its qualifications to conduct business as an LLC, its name, its federal taxpayer identification number, seals, member meeting minute books,

115

membership interest transfer books, blank membership interest certificates, and other documents relating to Texas RHH's organization, maintenance, and existence.

During trial, Angie testified that Maxus had acquired the agreement for email services with Hostway under the APA because it was a license agreement and involved computer software used by Texas RHH relating to the home healthcare business. While that agreement is not contained in the APA's schedules, the jury could have found that it was included under the "other necessary assets" provision as an asset necessary to continue conducting business operations in substantially the same manner as Texas RHH had historically done so, particularly as the record reflects that Maxus took over the email system on January 1, 2013, and used it until October 2014, when Brady locked it out. Accordingly, there was sufficient evidence from which the jury could have determined that Brady "accessed" the email system by intercepting and altering data or computer software in a computer network or system without Maxus's effective consent.

Further, the record reflects that Brady's access occurred around the same time that Maxus had discovered that the IRS had placed a levy on Zera's Medicare payments and that Texas RHH had accumulated undisclosed tax liens prior to the APA's execution. Although Brady denied that the reason she had accessed the email system was to cover up her correspondence with Furtek, the jury was entitled to disbelieve her testimony and to find that she had intentionally and knowingly accessed the email system to hide her actions prior to the APA's execution.

116

Maxus was forced to seek a temporary injunction after Brady did not respond to its cease-and-desist letter. The record reflects that when Brady refused to change the contact information back to Maxus, Maxus paid "around $9,000" to obtain a new email system and server. While Brady argues that Maxus could not have been damaged because it would have had to pay for email service regardless of her actions, because the jury implicitly found that Maxus had acquired the email license agreement under the APA, Maxus was damaged by having to obtain a new email system and server after Brady had foreclosed its access to the one that it had purchased under the APA. We correct the judgment from $9,628.89 in damages to $9,000, to reflect the amount supported by testimony in the record, and overrule this portion of Appellants' fourth issue.

Finally, although Brady contended in her trial testimony that Maxus did not acquire the email system or her historical emails—including personal emails—that had been in the system since 2006, the jury was entitled to find that Maxus had acquired the email system and any historical business records therein that were relevant to the home healthcare business under APA Sections 1.1(a)(ix), (xi), and (xiii), less any records related to Texas RHH's status as an LLC under Section 1.1(d)(viii). Therefore, we overrule the remainder of Appellants' fourth issue.

## F. Zera Claims

117

In their third issue, Appellants challenge the trial court's awards to Maxus for promissory estoppel based on the value of Zera's Medicare provider number ($250,000) and for breach of the Maxus–Zera management agreement ($115,112.83).

## 1. Promissory Estoppel

Promissory estoppel is an equitable remedy that is unavailable when an express contract covers the dispute's subject matter. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). The requisites of promissory estoppel are a promise, foreseeability of reliance thereon by the promisor, and substantial reliance by the promisee to his detriment. *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 761 (Tex. App.—Fort Worth 2012, pet. denied); *see In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 (Tex. 2005) (orig. proceeding). Promissory estoppel does not create liability where none otherwise exists; rather, it prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them. *Weekley Homes*, 180 S.W.3d at 133.

Under the theory of promissory estoppel, a party that has failed to prove a legally sufficient contract but who has acted in reliance upon a promise to his detriment may be compensated for his foreseeable, definite, and substantial reliance. *Lucas v. Ryan*, No. 02-18-00053-CV, 2019 WL 2635561, at *18 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.). In a promissory-estoppel action, a plaintiff's recovery is limited solely to reliance damages, which are the amounts

necessary to restore the plaintiff to the position in which he or she would have been without reliance on the promise. *Id.*

Appellants argue that the trial court erred by entering judgment against Zera based on promissory estoppel when (1) Zera did not promise to transfer its provider number; (2) at most there was an unenforceable agreement to agree on the terms of a sale at some point in the future; and (3) even if Zera had promised to transfer its provider number, there is no evidence that Maxus detrimentally relied on that promise because its only damages were unrecoverable expectation damages.

Maxus responds that there is legally sufficient evidence to support the jury's finding when, "[f]rom the outset," Zera's provider number "was always part of the deal" and "was always included as part of the 'Renew Home Health' business [that] Brady was selling" because Brady had included Zera's financial performance and patient count in the information that she had given Maxus, had characterized Zera's Granbury office as a branch office, and had conducted Zera's operations under "Renew Home Health."

No one disputed that because of the 36-month rule, January 2014 was the earliest a transaction for change of ownership of the Zera provider number could have occurred. The only references to Zera's provider number in the APA are in Section 2.12(g), which implicitly acknowledges that the Zera provider number was *not* included, to protect Maxus from having to enroll as an initial applicant, and Section 4.15, which states that Maxus would execute a management agreement with Zera until

119

a purchase agreement could be executed "after the required third anniversary of the Medicare Provider enrollment of January 19, 2011."

Notwithstanding the language in Section 2.12(g), however, Angie testified that the Zera provider number was sold to Maxus in the APA and that the parties just needed to "paper the purchase" after January 2014. Angie said that when she had asked Hammer about whether Zera's provider number should be listed under the APA's acquired seller permits, Hammer had told her that the number was not owned by Texas RHH and that it was covered by Section 4.15.

Pursuant to APA Section 4.15, Maxus and Zera entered into a three-page management agreement that says nothing about the provider number. And although the LOI had indicated Brady's intent to sell the Zera provider number to Maxus at that time, the LOI expired, and subsequent negotiations did little to clarify exactly what was being sold. Brady never told Hammond that the Zera provider number was not part of the deal when the parties agreed to $8.8 million.

In July 2014, Angie sent Brady a draft purchase agreement for Zera as contemplated by Section 4.15, referencing $100 "in hand paid and other valuable consideration." But while Hammer acknowledged that under that language, there would be no additional money paid beyond the referenced $100, he also made clear during his testimony that he did not "get involved in purchase price." Brady told Angie that there would have to be a purchase agreement in place "because the purchase agreement would also have to be sent to Medicare."

120

The APA's plain language does not expressly address the transfer of the Zera provider number, and the APA's merger clause states that the APA contains the parties' entire understanding and agreement "with respect to the subject matter hereof," i.e., Texas RHH's assets, "and supersedes all prior discussions, understandings, and agreements (whether oral or written) between them with respect hereto." Accordingly, promises made before the APA was executed could not provide a basis for the promissory estoppel award. *See Matlock Place Apts., L.P. v. Druce*, 369 S.W.3d 355, 378 (Tex. App.—Fort Worth 2012, pet. denied).

Because the merger clause prevented reliance on any of the promises made before the APA's execution, the only remaining basis for Maxus's promissory-estoppel theory would be a post-contractual agreement to transfer the Zera provider number. The only evidence of a post-contractual agreement consisted of the parties' communications about the draft Zera purchase agreement and Hammond's testimony that Brady and Hammer had told Maxus that "they would sign over the provider number as soon as they" had Zera's tax lien resolved. But nothing in the record reflects how Maxus detrimentally relied on these statements. We sustain this portion of Maxus's third issue and delete the $250,000 award from the trial court's judgment.

## 2. Breach of Contract

Under Section 3(a) of the management agreement, "[a]ll payments, reimbursements, and any collections from all payor sources shall be paid directly to [Maxus]," and under Section 3(b), Zera agreed "to reimburse [Maxus] for all necessary

121

and reasonable expenses and fees, agreed upon by [Zera], incurred on behalf of [Zera]." Section 5 contains reciprocal provisions that the parties, their agents, and employees "shall not be liable to [the other party] or to any other person for any action or omission in the performance of its obligations under the Agreement, except in cases of fraud or gross misconduct."

Appellants complain that the trial court erred by entering judgment against Zera for breach based on Section 5's exclusion of liability except in cases of fraud or gross misconduct, as to which they argue that there is no evidence, and they argue that Maxus did not plead or submit the issue of fraud or gross misconduct to the jury to obtain these necessary findings. Maxus states that Zera failed to raise section 5 at the charge conference and thus has waived it but that, regardless, fraud and gross misconduct were "clearly present here."

In its live pleadings, Maxus alleged that it had entered into the management agreement with Zera and had performed all of its obligations; that Zera had breached the agreement due to the IRS levy on payments that belonged to Maxus; that Zera had breached the agreement by terminating it without 30 days' notice and before January 1, 2016; and that Maxus was entitled to "certain sums of money that Zera ha[d] wrongfully retained." Maxus did not allege that Zera had committed fraud or gross misconduct in conjunction with the alleged breaches. Neither party raised Section 5 during the charge conference, and the question Maxus submitted to the jury was "Did Zera fail to comply with the Management Agreement?"

122

The plain language of Section 5 requires a finding of fraud or gross misconduct in order for one party to recover from the other party for any action or omission in performance of the obligations under the agreement. As the plaintiff, Maxus had the obligation to plead and try the issue and to obtain a finding of fraud or gross misconduct in order to recover for a breach by Zera regarding its performance of its obligations under the agreement.

Further, while fraud and breach of contract were the case's overarching themes, nothing in the record reflects fraud or gross misconduct by Zera in the performance of the management agreement. Specifically, the evidence showed that the $92,800 levy was based on Zera's 2010 payroll taxes, which occurred both before Zera entered into the management agreement and before Brady had purchased Zera, and there was no evidence of fraud or gross misconduct in Zera's performance of its obligations under the agreement regarding the remaining $23,112.83 owed to Maxus or in terminating the contract without giving 30 days' notice—just simple breach of contract. There is additionally no evidence that the parties thought that they were trying the question of fraud or gross misconduct in Zera's performance of its obligations under the management agreement. *See City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 744–45 (Tex. App.—Fort Worth 2008, pet. dism'd).

Maxus had the burden to prove the issue and to obtain the requisite findings but failed to do so. Accordingly, we sustain this portion of Appellants' third issue and delete Maxus's recovery of $115,112.83 from the judgment.

## IV. Double Recovery

In the remainder of their fifth issue, Appellants argue that the trial court erred by awarding Maxus a double recovery[100] by failing to provide Texas RHH a settlement credit for Furtek even though it allowed one as to Brady, by failing to credit the escrow funds against the fraud damages, and by permitting Maxus to recover for the alleged diminished value of Texas RHH from both Texas RHH and Brady.

The one-satisfaction rule limits a plaintiff to one recovery for damages suffered because of an injury. *In re Xerox Corp.*, 555 S.W.3d 518, 523 (Tex. 2018) (orig. proceeding); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) (op. on reh'g); *see Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) ("A double recovery exists when a plaintiff obtains more than one recovery for the same injury."). The fundamental consideration in applying the one-satisfaction rule is whether the plaintiff has suffered a single, indivisible injury—not the causes of action the plaintiff asserts. *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 107, 110 (Tex. 2018). The fact that more than one defendant may have caused the injury or that there may be more than one theory of liability does not modify the rule. *Id.* We review de novo the trial court's application of the one-satisfaction rule. *Id.* at 108.

## A. Settlement Credit

---

[100]Appellants acknowledge that the trial court applied the one-satisfaction rule when damages compensated Maxus for the same injury against the same defendant.

The one-satisfaction rule is intended to prevent a plaintiff's double recovery based on a single injury, regardless of a legal conclusion of joint liability. *Id.* at 113. A nonsettling defendant is entitled to a settlement credit when the settlement agreement covers the same injury for which the jury found the nonsettling defendant liable, even if the defendants were not adjudicated to be joint tortfeasors or jointly liable. *Id.* at 108, 114.

The trial court's judgment reflects that Brady was found jointly and severally liable with Furtek for fraud for the full amount of $2.3 million, less Furtek's $250,000 settlement credit. Appellants argue that Texas RHH was held liable for $2.3 million for breach of contract for the same injury and therefore was entitled to the same settlement credit. Under *Sky View*, we agree; we therefore sustain this portion of Appellants' fifth issue, and we reform the judgment to reflect that Furtek's $250,000 settlement credit applies to the judgment against Texas RHH for $2.3 million.

## B. Escrow Funds

Appellants argue that the $2.3 million awards did not account for the fact that Texas RHH never received the final payment from Maxus and that although the trial court awarded a credit for the escrow amount to reduce "the amount owed by Texas RHH for its breach of §§ 2.16 and 2.17 of the APA," it did not give Brady the same credit to reduce the fraud damages arising from the same injury.

Maxus responds that the money held in escrow has no double-recovery implications because Brady was not a party to the escrow agreement but

125

acknowledges that "the amounts paid to Texas RHH from the escrow account would come into play in any one-satisfaction analysis." Based on Maxus's acknowledgment, we sustain this portion of Appellants' fifth issue and reform the judgment to reflect that the escrow credit applies to the $2.3 million judgment against Brady.

## C. Same Injury

Both of Maxus's $2.3 million judgments were based on the difference between what Maxus agreed to pay for Texas RHH's assets and the assets' fair market value on December 31, 2012. *See id.* at 110 (noting that although the plaintiff asserted various causes of action against seven defendants, all of his allegations were based on the same, indivisible injury—nonpayment of a note—and all of the damages he sought were for the same amount).

Maxus responds that the one-satisfaction rule was not violated because the trial court can render judgment against multiple parties for the same injury or damages when the judgment has gone unsatisfied and refers us to *Daryapayma v. Park*, No. 02-15-00159-CV, 2016 WL 6519117 (Tex. App.—Fort Worth Nov. 3, 2016, no pet.) (mem. op.).[101] However, Maxus acknowledges that a double recovery issue might

---

[101]*Park* involved a single $150,000 injury arising from the parties' contract. 2016 WL 6519117, at *1. The plaintiff sued four defendants on different theories of recovery and received default judgments of $150,000 for two defendants who failed to answer and judgments for $150,000 each from the remaining two defendants after a jury trial on different theories—fraud, DTPA, and negligent misrepresentation as to one, and money had and received as to the other. *Id.* at *1–2. There was no evidence of any actual payment or satisfaction of the default judgments, *id.* at *3, and we held

arise if it ultimately collected $2.3 million from both Texas RHH and Brady. Maxus nonetheless points out that "at this point, there is no evidence that Maxus has attempted to collect anything from any party for anything" because of the bankruptcy stays. Maxus requests that we remand the case so that it can elect its preferred recovery if we decide that the judgment violates the one-satisfaction rule.[102]

As noted by Maxus, because of the bankruptcy stays, Maxus has not recovered anything yet. However, because of the possibility of a double recovery, Maxus should be given the opportunity to elect its preferred recovery. Accordingly, we sustain this portion of Appellants' fifth issue, and we remand this portion of the case to the trial court so that Maxus may make an election. *See Waite Hill*, 959 S.W.2d at 184.

## V. Attorney's Fees and Expenses

The trial court awarded $1,237,655.87 in attorney's fees to Maxus against Texas RHH based on "Texas RHH's breaches of the APA"; $53,006.09 in attorney's fees to Maxus against Zera based on "Zera's breaches of the Management Agreement";

---

that the trial court did not run afoul of the one-satisfaction rule when none of the judgments had been satisfied. *Id.* at *1–2.

[102]Appellants argue in their reply brief that instead of allowing Maxus an election, we should "use the findings awarding the greatest theory of recovery and render judgment accordingly." *See Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 613 (Tex. App.—Fort Worth 2006, pet. denied). However, with the deductions for the escrow amount and settlement credit applied to both the contract damages against Texas RHH and the fraud damages against Brady, the damages amounts are identical. Accordingly, we must remand for Maxus to make an election. *See Waite Hill*, 959 S.W.2d at 184–85 (remanding case to trial court after holding that the trial court had erred when it had refused defendant's request for plaintiff to elect a remedy when contract and tort damages were identical).

$15,901.83 in attorney's fees to Maxus against Brady based on "Brady's harmful access of Maxus's computer"; and $15,901.83 in attorney's fees to Maxus as "the prevailing party on BP Chaney's claim . . . pursuant to the Commercial Lease Agreements." The trial court also awarded $818,525.76 to Maxus against Texas RHH for "expert witness fees, costs for copies of depositions, costs of court[,] and other expenses." In their sixth issue, Appellants argue that the trial court erred by awarding attorney's fees and expenses to Maxus based on grounds that were not pleaded or that were prohibited and erred by denying BP Chaney its fees as the prevailing party on Maxus's abandoned breach-of-contract claim.

Because we have reversed the trial court's judgment as to Zera's breach of the management agreement, Maxus is not entitled to the $53,006.09 in attorney's fees associated with that breach. Therefore, we sustain this portion of Appellants' sixth issue and reform the trial court's judgment to delete this provision and the conditional appellate attorney's fees that were awarded with it.

## A. Specific Grounds

Appellants point out that Maxus specifically pleaded for attorney's fees only under Civil Practice and Remedies Code Chapter 37 (declaratory judgments) and Chapter 38 (oral and written contracts)[103] but that the trial court awarded attorney's

---

[103]In Maxus's live pleading, Maxus alleged that "as a consequence of Defendants' wrongful conduct," it was forced to retain two law firms to prosecute its claims and had demanded that Appellants perform their respective contractual obligations. Because Appellants had refused, Maxus stated that it was entitled to

fees against Texas RHH under the APA's terms, which Maxus did not plead; attorney's fees against Brady under the statute governing civil liability for harmful access of a computer, which Maxus also did not plead; and attorney's fees against BP Chaney under the lease terms, which Maxus did not plead. There were no pending declaratory judgments at the time of the attorney's fees hearing.

"[W]hen a party pleads specific grounds for the recovery of attorney's fees, he cannot recover attorney's fees on another, unpleaded ground." *Jones v. Frank Kent Motor Co.*, No. 02-14-00216-CV, 2015 WL 4965798, at *4 (Tex. App.—Fort Worth Aug. 20, 2015, no pet.) (mem. op.); *see Nat'l City Mortg. v. Adams*, 310 S.W.3d 139, 143 n.4 (Tex. App.—Fort Worth 2010, no pet.) (op. on reh'g) (citing *Smith v. Deneve*, 285 S.W.3d 904, 916 (Tex. App.—Dallas 2009, no pet.)); *see also Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 659 (Tex. 2009) (holding that appellant waived its right to recover attorney's fees under the parties' contract because it did not plead for fees under the contract, never sought to amend its pleadings to do so, and failed to submit a jury question on the issue).

Further, a party seeking recovery of attorney's fees, even under a mandatory statute, must still sufficiently notify the court and opposing party of his intent to recover his attorney's fees under that statute. *Jones*, 2015 WL 4965798, at *3; *see Shaw v. Lemon*, 427 S.W.3d 536, 540 (Tex. App.—Dallas 2014, pet. denied) ("[A] pleading

recover its reasonable and necessary attorney's fees and cited Civil Practice and Remedies Code Sections 37.001 and 38.001.

129

that does not ask for an award of attorney's fees under a mandatory statute does not give notice to the opposing party of all the relief sought."). Thus, although a person who establishes a cause of action under Chapter 143 (Harmful Access by Computer) "is entitled to" reasonable attorney's fees and costs, *see Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (stating that "is entitled to" denotes attorney's fees that are not discretionary), because Maxus did not plead for its attorney's fees under that provision, it could not recover them. *See Jones*, 2015 WL 4965798, at \*3–4. Likewise, because Maxus did not plead for its attorney's fees pursuant to the leases, it was not entitled to an award of them. *See id.*

And as Appellants pointed out at the hearing on attorney's fees and in their brief, Texas RHH is an LLC. Section 38.001 provides that a person may recover reasonable attorney's fees "from an individual or corporation" for, among other things, a claim for an oral or written contract. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8). Although this court has not yet addressed whether attorney's fees can be recovered under this provision from an LLC, several of our sister courts have addressed this issue and have concluded that based on the statute's plain language and the distinctions between corporations and LLCs, such a recovery is not allowed. *See Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 453–55 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *see also Phoneternet, LLC v. Drawbridge Design*, No. 05-17-00890-CV, 2018 WL 3238001, at \*2–3 (Tex. App.—Dallas July 3, 2018, no pet.) (mem. op.) (following *Alta Mesa*); *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d

130

176, 188 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (following *Alta Mesa*, among others); *First Cash, Ltd. v. JQ-Parkdale, LLC*, 538 S.W.3d 189, 194–200 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (following *Alta Mesa* and reconciling Section 38.001 with cases construing its predecessor statute); *8305 Broadway Inc. v. J & J Martindale Ventures, LLC*, No. 04-16-00447-CV, 2017 WL 2791322, at \*4–5 (Tex. App.—San Antonio June 28, 2017, no pet.) (mem. op.) (following *Alta Mesa*, among others). *See generally Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011) (stating that under the "American Rule," litigants may recover attorney's fees only if specifically provided for by statute or contract). Convinced by our sister courts' reasoning, we hold that an LLC is not liable for attorney's fees under Section 38.001 and sustain this portion of Appellants' sixth issue.

Finally, although Maxus argues that it should be able to recover its attorney's fees against Texas RHH as damages under APA Section 6.2, as pointed out by Appellants, Maxus did not make this argument until the attorney's fees hearing after trial had concluded. When asked whether Maxus had pleaded for attorney's fees as compensatory damages under the contract, Maxus's counsel replied, "I'm sure we did," and said that the live pleading "requested, I'm confident, all damages sustained by the breach of contract." But under its claim for breach of contract in its live pleading, Maxus merely stated,

> As a proximate and foreseeable result of [Appellants'] respective breaches of the foregoing contracts, Maxus has been damaged, for which sums Maxus hereby sues, in an amount that exceeds the jurisdictional

131

limits of this Court. Maxus seeks its actual, special[,] and consequential damages it sustained, including out-of-pocket and benefit-of-the-bargain damages, plus pre- and post-judgment interest at the highest rate allowed by applicable law. Additionally, Maxus seeks specific performance that requires Brady and/or Zera to transfer Zera's Medicare Provider Number to Maxus. Maxus also seeks specific performance that requires RHH and Brady to provide Maxus with possession of all Acquired Assets.

Maxus did not mention that it was seeking attorney's fees and expenses as damages under the APA in any portion of its pleading; its prayer for relief separately and generically asked for "[a]ctual, special (including out-of-pocket and benefit-of-the-bargain damages)[,] and consequential damages" and "[r]easonable and necessary attorneys' fees." Appellants argued at the hearing that Maxus's petition did not provide fair notice that it was seeking attorney's fees under the APA. *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 171 (Tex. 2013) (orig. proceeding); *see also In re Xerox Corp.*, 555 S.W.3d 518, 529 (Tex. 2018) (orig. proceeding) (explaining that "damages" are "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury" and that attorney's fees are generally not damages, even if compensatory (quoting Black's Law Dictionary 471 (10th ed. 2014)).

Based on the longstanding distinction between attorney's fees and damages made by the supreme court, we agree that Maxus's petition did not provide sufficient notice that it was seeking attorney's fees or expenses under the APA. *See Nalle Plastics*, 406 S.W.3d at 172–73 (noting that courts have long distinguished attorney's fees from damages and that the legislature has also made distinctions based on the

compensation owed for an underlying harm and the fees that may be awarded for counsel's services); *see also Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 135 (Tex. 2019) ("Texas law is clear that attorney's fees and costs incurred in the prosecution or defense of a claim, although 'compensatory in that they help make a claimant whole,' are not damages."); *Anadarko Petroleum Corp. v. Houston Cas. Co.*, 573 S.W.3d 187, 196 (Tex. 2019) (referencing *Nalle Plastics* for the proposition that attorney's fees are generally not damages, even if compensatory); *In re Corral-Lerma*, 451 S.W.3d 385, 386–87 (Tex. 2014) (orig. proceeding) (stating that statutory distinction between Civil Practice and Remedies Code Section 38.001 and the Texas Theft Liability Act "does not undermine the inherent differences between compensatory damages and attorney's fees we acknowledged in *Nalle Plastics*").

We sustain these portions of Appellants' sixth issue and reform the trial court's judgment to delete the $15,901.83 in attorney's fees assessed against Brady on the harmful-access-of-computer claim, the $15,901.83 in attorney's fees assessed against BP Chaney for breach of lease, the $1,237,655.87 in attorney's fees assessed against Texas RHH for breach of contract, the conditional appellate attorney's fees that were awarded with each, and the $818,525.76 assessed against Texas RHH for expert witness fees, costs, and other expenses.

## B. Prevailing Party

Appellants contend that the trial court should have awarded to BP Chaney its attorney's fees and expenses—$148,225.99—as the prevailing party on Maxus's

nonsuited breach-of-lease claims. Maxus replies that BP Chaney did not prevail on its claim because the jury found that Maxus did not breach the leases and because BP Chaney did not obtain the requisite finding under *Epps* that would have entitled it to attorney's fees.

The lease agreements between BP Chaney and Maxus contain the following provision: "**ATTORNEY'S FEES:** Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, reasonable attorney's fees, and all other costs of litigation from the nonprevailing party."

This provision is similar to that which the supreme court interpreted in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019), when the operative event was that a party prevail "in any action to enforce the terms of the Lease." *Id.* at 484–85. In *Rohrmoos*, the court considered whether a party could be a prevailing party under the contract when it did not seek or obtain monetary damages but rather successfully defended itself from the other party's breach-of-contract counterclaim. *Id.* at 485. The court held that a defendant "can obtain actual and meaningful relief, materially altering the parties' legal relationship, by successfully defending against a claim *and securing a take-nothing judgment on the main issue or issues in the case.*" *Id.* at 486 (emphasis added). Because the trial court rendered a take-nothing judgment in the party's favor as a counterdefendant, this altered the parties' legal relationship and made that party the "prevailing party" under the lease and entitled to

134

reasonable and necessary attorney's fees. *Id.*; *see also Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 148 (Tex. 2019) (stating, in summary judgment context, that a defendant "prevails" when the plaintiff loses with prejudice, whether on the merits or for some other reason, and citing *Epps*, 351 S.W.3d at 868).[104]

Appellants argue that BP Chaney is the prevailing party because Maxus voluntarily withdrew its breach-of-contract claims against BP Chaney on the eve of closing arguments by deciding not to submit those claims to the jury[105] and because

---

[104]*Epps* involved a plaintiff's nonsuit without prejudice after the defendant sought partial summary judgment. 351 S.W.3d at 865. When a plaintiff nonsuits a case *with* prejudice, the defendant is the prevailing party because the res judicata effect of a nonsuit with prejudice works a permanent, inalterable change in the parties' legal relationship to the defendant's benefit in that the defendant can never again be sued by the plaintiff (or its privies) for claims arising out of the same subject matter. *Id.* at 868–69. A defendant *may* be a prevailing party when the plaintiff nonsuits *without* prejudice "if the trial court determines, on the defendant's motion, that the nonsuit was taken to avoid an unfavorable ruling on the merits." *Id.* at 870. The court recited plaintiff's actions that may support an inference that a nonsuit was taken to avoid an unfavorable ruling and noted that evidence that the suit was not without merit when filed may indicate that the defendant has not prevailed and is therefore not entitled to attorney's fees. *Id.* at 870–71. In resolving *Epps*, the court relied in part on *KB Home*, in which it had reasoned that whether a party prevails turns on whether it prevails upon the court to award it something, either monetary or equitable, that materially alters the parties' legal relationship. *Id.* at 864, 866 (citing 295 S.W.3d at 652, 655).

[105]While Appellants' lead trial court counsel opined that the claims were nonsuited to avoid trial on the merits of those claims, Maxus's counsel said that Maxus "simply did not submit those questions on Maxus'[s] claims on the lease . . . to the jury" after the parties' charge conference that lasted until around 2:30 a.m. The trial judge asked whether it made a difference if "the Court may have said by probably the implicit blessing of everyone there, 'Okay. We're not going to worry about it,' or that it was effectively withdrawn, it sounds like, what happened?" Maxus's counsel said that during the charge conference, they had worked on "whittling down" the charge from over 100 pages.

135

limitations has run, preventing Maxus from being able to sue for claims arising out of the same subject matter. Appellants refer us to *www.urban.inc v. Drummond*, 508 S.W.3d 657, 667 (Tex. App.—Houston [1st Dist.] 2016, no pet.),[106] and *Jordan v. Bustamante*, 158 S.W.3d 29, 36 (Tex. App.—Houston [14th Dist.] 2005, pet. denied),[107] in support of their argument.

Maxus points out that BP Chaney failed to secure a finding from the trial court that Maxus's decision to not submit its claims to the jury "was taken to avoid an unfavorable ruling on the merits" and that the trial court did not award BP Chaney any attorney's fees, thus "implicitly [finding] that Maxus's decision to not submit its breach-of-lease claims was not made to avoid an unfavorable result."

---

[106]In *Drummond*, the court held that a "prevailing party" is one that succeeds on the case's "main" issue, which is the issue or issues that are fully litigated and properly submitted to the jury after being the primary focus of a full trial on the merits. 508 S.W.3d at 668. It held that the appellee was the prevailing party when he obtained a take-nothing judgment on the appellant's breach-of-contract claim, which—along with the appellee's affirmative defenses to that claim—were the main issues in the case. *Id.* at 668–69; *see Rohrmoos*, 578 S.W.3d at 486.

[107]In *Jordan*, the court recognized that abandoning a cause of action after trial begins can have a res judicata effect. 158 S.W.3d at 36. That, alone, however, may not be enough to "prevail." In an attorney's-fees provision that entitles a "prevailing party" to recover fees without distinguishing between successful prosecution or successful defense of a claim, there is a distinction between a "prevailing" plaintiff and a "prevailing" defendant in that a defendant is the prevailing party if it obtains a take-nothing judgment on the main issue or issues in the case regardless of whether it recovers any damages or obtains other relief. *Severs v. Mira Vista Homeowners Ass'n, Inc.*, 559 S.W.3d 684, 707–08 (Tex. App.—Fort Worth 2018, pet. denied) (holding that HOA received a favorable disposition on merits when it obtained a take-nothing summary judgment on the plaintiffs' claims, changing the parties' legal relationship).

The "main issue" between BP Chaney and Maxus was breach of lease, the jury found that Maxus did not breach the lease, and Maxus opted not to submit a question on breach of lease by BP Chaney to the jury in the 69-question jury charge although the record reflects that there was evidence to support submission of that question. Given the number of "main issues" between all of the parties in this case,[108] we cannot say, especially when BP Chaney failed to obtain a take-nothing judgment on Maxus's claim,[109] that BP Chaney prevailed by changing the parties' legal relationship when Maxus could have decided that additional questions on what amounted to a minor claim in the overall case could have confused the jury. *See Severs*, 559 S.W.3d at 707. Accordingly, we overrule the remainder of Appellants' sixth issue.

## VI. Conclusion

---

[108]When asked whether lease-related issues "probably didn't even add up to a half day of a six-week trial," Appellants' lead trial counsel agreed and acknowledged that the trial's focus had been on the tax and financial representations. Appellee's counsel testified that the BP Chaney lease issue "was a very tiny issue [in the overall case] that did not take much time at all."

[109]At the hearing on Maxus's motion for entry of judgment, Appellants broadly requested that the trial court enter a take-nothing judgment for Maxus, which the trial court implicitly denied, and none of the *Epps* factors appear here: (1) Maxus did not nonsuit its breach-of-lease claim against BP Chaney in response to a merits-preclusive motion; (2) Maxus did not fail to respond to discovery requests; (3) Maxus did not fail to timely identify experts or other critical witnesses—rather, the record reflects that for six weeks, the jury was inundated with information from such witnesses; and (4) the record does not reflect the existence of other procedural obstacles that could have defeated Maxus's breach-of-lease claim against BP Chaney. *Cf.* 351 S.W.3d at 870–71. And there is evidence in the record that Maxus's breach-of-lease claim against BP Chaney was not without merit. *See id.* at 871.

We affirm the trial court's judgment in part, as corrected below:

- Having sustained part of Appellants' first and second issues, we
    - delete the award of $31,000 to Maxus under APA Section 2.16;
    - delete the award of $250,000 to Maxus under APA Section 4.15;
    - delete the specific performance requirement as to Zera's Kinnser software system; and
    - remand for the trial court to reconsider the $100,000 awarded to Maxus under APA Section 2.16.

- Having sustained Appellants' third issue, we delete the $115,112.83 awarded to Maxus for breach by Zera and the $250,000 awarded to Maxus against Zera for promissory estoppel.

- Pursuant to Appellants' fourth issue, we reform the harmful-access-of-computer award to reflect $9,000.

- Having sustained part of Appellants' sixth issue, we
    - delete the award of $1,237,655.87 in attorney's fees against Texas RHH;
    - delete the award of $818,525.76 in costs and other expenses against Texas RHH;
    - delete the award of $53,006.09 in attorney's fees against Zera;
    - delete the award of $15,901.83 in attorney's fees against Brady; and
    - delete the award of $15,901.83 in attorney's fees against BP Chaney.

- Having sustained part of Appellants' fifth issue (the remainder of Appellant's fifth issue having been rendered moot per the above), we hold that while Texas RHH is liable for $2.3 million for breach of contract, less the $250,000 settlement credit and the escrow amount, and that Brady is liable for $2.3 million for fraud, less the $250,000 settlement credit and the escrow amount, this portion of the case is remanded to the trial court for Maxus to make an election between its recovery for breach-of-contract claim and for fraud.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: December 17, 2020